**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| BEAN MAINE LOBSTER, INC., MAINE LOBSTERMEN'S ASSOCIATION, INC., MAINE COAST FISHERMEN'S ASSOCIATION, INC., MAINE LOBSTER AND PROCESSING, LLC d/b/a ATWOOD LOBSTER, LLC., and BUG CATCHER, INC., <br><br> Plaintiffs, <br><br>　-　v.　- <br><br> MONTEREY BAY AQUARIUM FOUNDATION, <br><br> Defendant. | Civ. Action No. 2:23-CV-00129-JAW |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS, OR IN THE ALTERNATIVE**
**TO CHANGE VENUE**

ROACH RUPRECHT SANCHEZ & BISCHOFF P.C.
527 Ocean Avenue, Suite 2
Portland, ME  04103
(202) 747-4870

VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTS RELEVANT TO THIS MOTION ........................................................................ 4

ARGUMENT ..................................................................................................................... 8

POINT I - THIS COURT HAS PERSONAL JURISDICTION BECAUSE THE AQUARIUM REACHED INTO MAINE TO DEFAME MAINE RESIDENTS AND COULD REASONABLY FORESEE HAVING TO DEFEND ITSELF IN A MAINE COURT. ............................................... 8

    A.  The Supreme Court's Decision in *Calder v. Jones* Confirms That the Aquarium is Subject to Specific Personal Jurisdiction in Maine. ...................................................................... 8

    B.  The Aquarium Intentionally Directed Defamatory Statements at Maine and Enjoyed the Protection of Maine Law. ............................................................................................ 10

        1.  The Claims Are Related to the Aquarium's Contacts With Maine ............................... 10

        2.  The Aquarium Purposefully Availed Itself of the Maine Forum ................................... 12

        3.  It Is Reasonable to Subject the Aquarium to Personal Jurisdiction in Maine Concerning Its Statements About Maine Lobster Fishing ........................................................... 13

    C.  The Authorities Cited by the Aquarium Are Inapposite. ......................................... 13

POINT II - THERE IS NO BASIS TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF CALIFORNIA ................................................................................................... 14

POINT III - MAINE'S ANTI-SLAPP STATUTE DOES NOT APPLY TO THIS CASE BECAUSE THE AQUARIUM WAS NOT EXERCISING ITS RIGHT TO PETITION. .............. 17

    A.  The Aquarium's Statements Were Aimed at Consumers and Businesses and Were Not Designed to Influence Government ....................................................................... 17

    B.  Plaintiffs Have Made a Prima Facie Case That the Statements Were Intentionally False and Caused Actual Injury ............................................................................................. 21

POINT IV - THE COMPLAINT ALLEGES SUFFICIENT FACTS TO SUPPORT PLAINTIFFS' DEFAMATION CLAIMS. ........................................................................................... 22

    A.  The Aquarium's Statements Were About Plaintiffs. .............................................. 23

    B.  The Aquarium Defamed All Businesses That Harvest or Sell Lobsters From the Gulf of Maine and Georges Bank Fisheries. ................................................................... 26

    C.  The Aquarium Expressed and Implied Verifiably False Facts About the Maine Lobster Industry, and Did Not Merely Express Opinions or Hyperbole. ........................... 28

    D.  Plaintiffs Have Adequately Pled State of Mind. ................................................... 34

    E.  An Injunction Against Continued Publication of Defamatory Statements Is Constitutionally

Valid and Is Not an Impermissible Prior Restraint. ..............................................................35

F.   If Necessary, Plaintiffs Should Be Given Leave to Amend the Complaint. ........................35

CONCLUSION ..............................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Corp. v. All American Plumbing, Inc.*,
812 F.3d 54 (1st Cir. 2016) ...................................................................................10

*Amyndas Pharm., S.A. v. Zealand Pharma A/S*,
48 F.4th 18 (1st Cir. 2022) ...................................................................................36

*Arcand v. Evening Call Publ'g Co.*,
567 F.2d 1163 (1st Cir. 1977) ..............................................................................27

*Ashcroft v. Free Speech Coalition*
535 U.S. 234 (2002) ..............................................................................................35

*Astro-Med, Inc. v. Nihon Kohden Am.*,
591 F.3d 1 (1st Cir. 2019) ....................................................................................13

*Banjo Buddies, Inc. v. Renosky*,
156 F. Supp. 2d 22 (D. Me. 2001)........................................................................16

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) ..............................................................................................17

*Broadvoice, Inc. v. TP Innovations LLC*,
733 F. Supp. 2d 219 (D. Mass. 2010) ..................................................................14

*Calder v. Jones*,
465 U.S. 783 (1984) ........................................................................................*passim*

*Canales v. Univ. of Phoenix, Inc.*,
No. 2:11-cv-00181-JAW, 2012 U.S. Dist. LEXIS 88930 (D. Me. June 27, 2012)
(Woodcock, J.) .......................................................................................................15

*Caron v. Bangor Publishing Co.*,
470 A.2d 782 (Me. 1984).......................................................................................29

*Cianbro Corp. v. Curran-Lavoie, Inc.*,
814 F.2d 7 (1st Cir. 1987)......................................................................................16

*Cianci v. New Times Pub. Co.*,
639 F.2d 54 (2d Cir. 1980) ....................................................................................30

*Clay Corp. v. Colter*,
No. NOCV2012-01138, 2012 WL 6554752 (Mass. Super. Dec. 11, 2012) ..............................20

*Coady v. Ashcraft & Gerel*,
223 F.3d 1 (1st Cir. 2000) ...............................................................................................15, 16

*Cohen v. Zaic*,
No. cv-06-236, 2007 Me. Super. LEXIS 105 (May 23, 2007)...........................................14

*Conformis, Inc. v. Aetna, Inc.*,
58 F.4th 517 (1st Cir. 2023) ...........................................................................26, 28, 33, 34

*Cossaboon v. Maine Med. Ctr.*,
600 F.3d 25 (1st Cir. 2010) .............................................................................................13

*Cross v. Guy Gannett Publishing Co.*,
151 Me. 491, 121 A.2d 355 (1956) ..................................................................................30

*CVS Pharmacy, Inc. v. Lavin*,
951 F.3d 50 (1st Cir. 2020) .............................................................................................18

*Fawcett Publications, Inc. v. Morris*,
1962 OK 183, 377 P.2d 42 ...............................................................................................28

*Filler v. Hancock Cty.*,
1:15-cv-00048-JAW, 2016 US Dist. LEXIS 10777 (D. Me. Jan. 27, 2016),
(Woodcock, J.) .............................................................................................................18, 19

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
141 S. Ct. 1017 (2021) .......................................................................................................8

*Gaprindashvili v. Netflix, Inc.*,
No. 221CV07408VAPSKX, 2022 WL 363537 (C.D. Cal. Jan. 27, 2022) ..................................23

*Gaudette v. Mainely Media, LLC*,
2017 ME 87, 160 A.3d 539 ..........................................................................................17, 18

*Gentle Wind Project v. Garvey*,
No. 04-103-P-C, 2005 U.S. Dist. LEXIS 261 (D. Me. Jan. 10, 2005)...........................14

*Gray v. St. Martin's Press, Inc.*,
221 F.3d 243 (1st Cir. 2000) ...........................................................................................29

*Green v. Cosby*,
138 F. Supp. 3d 114 (D. Mass. 2015) ..............................................................................34

*Hearts with Haiti, Inc. v. Kendrick*,
2019 ME 26, 202 A.3d 1189 .......................................................................................20, 21

*Henderson v. Laser Spine Inst., LLC*,
815 F. Supp. 2d 367 (D. Me. 2011) (Woodcock, J.) ............................................................. 10, 13

*Hudson v. Guy Gannett Broadcasting Co.*,
521 A.2d 714 (Me. 1987) ................................................................................................... 23, 24

*Johnson v. VCG Holding Corp.*,
767 F. Supp. 2d 208 (D. Me. 2011) (Woodcock, J.) ............................................................. 15, 16

*Keds Corp. v. Renee Int'l Trading Corp.*,
888 F.2d 215 (1st Cir. 1989) ........................................................................................................ 13

*Kentucky Fried Chicken of Bowling Green, Inc. v. Sanders*,
563 S.W.2d 8 (Ky. 1978) .............................................................................................................. 27

*Levesque v. Doocy*,
560 F.3d 82 (1st Cir. 2009) ........................................................................................................... 31

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) ........................................................................................................ 29

*Lynch v. Christie*,
No. 2:11CV70-DBH, 2012 U.S. Dist. LEXIS 165628 (D. Me. Nov. 20, 2012) ................... 22, 24

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
__ F.4th __, 2023 U.S. App. LEXIS 14987 (D.C. Cir. 2023) ...................................................... 32

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) .......................................................................................................................... 33

*Motus, LLC v. Cardata Consultants, Inc.*,
23 F.4th 115 (1st Cir. 2022) ......................................................................................................... 14

*N.Y. Wiping & Indus. Prod. Co. v. Rocky Brands, Inc.*,
No. 09-1237 (JAF), 2009 U.S. Dist. LEXIS 77827 (D.P.R. Aug. 31, 2009) .............................. 16

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ................................................................................................................ 19, 20

*Nader v. Me. Democratic Party*,
2012 ME 57, 41 A.3d 551 ....................................................................................................... 21, 22

*Noonan v. Winston Co.*,
135 F.3d 85 (1st Cir. 1998) ........................................................................................................... 12

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*
720 F.3d 490 (2d Cir. 2013) .................................................................................................... 32, 33

*United States v. Ortiz-Islas*,
No. 1:12-cr-00125-JAW, 2013 U.S. Dist. LEXIS 34730 (D. Me. Mar. 13, 2013)
(Woodcock, J.) ........................................................................................................... 16

*Osgood v. C.U. York Insurance Co.*,
No. CIV.A. CV-04-568, 2006 WL 1980396 (Me. Super. June 5, 2006) .................................. 23

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
63 F.4th 240 (3d Cir. 2023) ........................................................................................... 32, 33

*Pan Am Systems Inc. v. Atlantic Northeast Rails & Ports, Inc.*,
804 F.3d 59 (1st Cir. 2015) ............................................................................................ 23

*Pritzker v. Yari*,
42 F.3d 53 (1st Cir. 1994) .............................................................................................. 10

*Robinson v. Guy Gannett Publishing Co.*,
297 F. Supp. 722 (D. Me. 1969) ..................................................................................... 23, 27

*Saad v. Am. Diabetes Ass'n*,
123 F. Supp. 3d 175 (D. Mass. 2015) .............................................................................. 32

*Schelling v. Lindell*,
2008 ME 59, 942 A.2d 1226 ........................................................................................... 21

*Scottsdale Cap. Advisors v. Deal LLC*,
887 F.3d 17 (1st Cir. 2018) ............................................................................................ 11

*Shire City Herbals, Inc. v. Blue*,
No. 15-30069-MGM, 2016 U.S. Dist. LEXIS 62888 (D. Mass. May 12, 2016) ........................ 20

*Sinclair v. Gannett*,
148 Me. 229, 91 A.2d 551 (1952) ................................................................................... 30

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) .............................................................................................. 34, 35

*Spofford v. Genthner*,
156 Me. 363, 165 A.2d 68 (1960) ................................................................................... 25

*Thurlow v. Nelson*,
2021 ME 58, 263 A.3d 494 ............................................................................................. 17, 19, 21

*US Dominion, Inc. v. Fox News Network, LLC*,
No. N21C-03-257 EMD, 2023 WL 2730567 (Del. Super. Ct. Mar. 31, 2023) ...................... 34, 35

*Veilleux v. Nat'l Broad. Co.*,
206 F.3d 92 (1st Cir.2000) .............................................................................................. 31

*Waugh v. Genesis Healthcare LLC*,
2019 ME 179, 222 A.3d 1063 ...................................................................................34

*Weller v. American Broadcasting Companies, Inc.*,
232 Cal. App. 3d 991 (Ct. App. 1991) ......................................................................30

**Constitutional Provisions and Statutes**

U.S. Const. Am. 1 .................................................................................................3, 20, 35

10 M.R.S.A. § 1212(1)(H) ...........................................................................................13

28 U.S.C. § 1404(a)................................................................................................. 1, 14

28 U.S.C. § 1441 ...........................................................................................................14

**Rules**

Fed. R. Civ. P. 9(b).......................................................................................................34

Fed. R. Civ. 12(b)(2) ................................................................................................. 1, 8

Fed. R. Civ. 12(b)(6) .............................................................................................*passim*

Plaintiffs Bean Maine Lobster, Inc. ("BML"), Maine Lobstermen's Association, Inc. ("MLA"), Maine Coast Fishermen's Association, Inc. ("MCFA"), Maine Lobster and Processing, LLC d/b/a/ Atwood Lobster, LLC ("Atwood"), and Bug Catcher, Inc. ("Bug Catcher") (collectively, "Plaintiffs") oppose Defendant Monterey Bay Aquarium Foundation's ("the Aquarium") motion seeking dismissal of Plaintiffs' complaint (the "Complaint") under Rule 12(b)(2), 14 M.R.S. § 556 (the "anti-SLAPP Statute"), and Rule 12(b)(6), or in the alternative, transfer of venue to the Northern District of California under 28 U.S.C. § 1404(a) (the "Motion").

## PRELIMINARY STATEMENT

As pled in the Complaint, the Aquarium defamed Plaintiffs and all others in the Maine lobster trade by publishing deliberate false statements about their business practices. The Aquarium told the general public that "scientific data" showed Maine lobsters were caught in a manner that kills and causes serious harm to right whales. But no such data existed. And the Aquarium knew it.

Based on these false statements, the Aquarium urged the public not to buy from businesses that catch and sell Maine lobsters. As the Aquarium intended, consumers and businesses believed these statements, and Plaintiffs' sales of Maine lobsters suffered. Plaintiffs then filed this lawsuit for an injunction requiring the Aquarium to remove the statements deemed defamatory from its website and to recover their lost business and other economic damages.

The Aquarium now disavows the factual claims it made. It characterizes its statements as "opinion based on tentative scientific data," "rhetorical hyperbole," and "theory." It argues that it never said that its statements were backed by "conclusive evidence." And, the Aquarium asserts that neither the law nor this Court offers recourse for the harms Plaintiffs suffered.

The Aquarium is wrong on all counts. In light of the well-pled allegations in the Complaint and other facts in the Motion record, there is no question that Plaintiffs have actionable defamation claims against the Aquarium under Maine law. The Aquarium's statements purported to communicate facts and that is precisely how they were understood. And this Court is the proper forum to adjudicate these claims. The Motion should be denied in full.

Anti-SLAPP Statute.  Maine courts have made clear that the anti-SLAPP statute applies only to a narrow category of constitutionally-protected speech that is not implicated here: petitioning the government.  Plaintiffs have not sued the Aquarium for any petitioning activity.  Rather, Plaintiffs' defamation claim concerns false statements that the Aquarium made directly to the general public for the express purpose of persuading businesses and consumers not to buy Maine-caught lobsters.  The Aquarium did not include its statements in any submission to a government body, nor did it ask any public official to change laws, rules, or policies.  The Aquarium suggests that its statements qualify as "petitioning" because they concerned matters regulated by federal and state agencies.  But Maine courts do not read the anti-SLAPP statute so broadly.  Indeed, if the anti-SLAPP statute applied to all public statements about matters that happen to be regulated by the government, it is hard to imagine what would *not* be covered by the statute, given the Nation's tapestry of federal, state and local regulations.

Rule 12(b)(6).  The Complaint pleads detailed facts to support Plaintiffs' defamation claims and satisfy Rule 12(b)(6).  The Aquarium falsely equates its statements to hyperbolic generalizations like "all lawyers are liars."  No reasonable person would understand such a flip statement to mean that the speaker possessed facts regarding the veracity of every single attorney.  But the Aquarium's statements here applied to *all* lobsters harvested in the Gulf of Maine and Georges Bank and were purportedly backed by "scientific data."  The Aquarium did not leave open the possibility that any Maine lobsters are caught in a manner that is safe for right whales.  The Aquarium's statements were reasonably understood by the public to refer to Plaintiffs and all others who harvest and sell Maine lobsters.

The Aquarium now characterizes its statements as opinions or conjecture, arguing that it did not claim to possess "conclusive evidence."  Def. Mem. at 31–33.  Tellingly, the Aquarium never communicated these caveats to the general public when it told them to stop buying Maine-caught lobsters because of "scientific data."  Readers reasonably understood that the Aquarium's statements about "scientific data" were representations of objective fact—not opinion, hyperbole,

or theory. The Aquarium's belated attempt to walk back its damaging statements do nothing but highlight the difference between what the Aquarium said and the truth.

The Aquarium's arguments regarding state of mind are inappropriate for consideration on a Rule 12(b)(6) motion. Plaintiffs are allowed to plead state of mind generally, and in any case, the Complaint alleges substantial facts that raise at least a plausible inference that the Aquarium acted with the requisite actual malice and negligence. For example, the Complaint alleges that the Aquarium was repeatedly shown evidence of the falsity of its statements before publishing them.

Finally, there is nothing unconstitutional about Plaintiffs' request for an injunction to remove the defamatory statements from the Aquarium's website. Such an injunction is not a "prior restraint" because it would apply only to statements that the Court determines are defamatory. Defamatory statements do not enjoy First Amendment protection. The Aquarium's continuing publication of these statements inflicts additional business losses on Plaintiffs every day, fueling Plaintiffs' urgency in pursuing this defamation claim and obtaining an injunction.

<u>Personal Jurisdiction.</u> The Aquarium seeks to avoid defending its defamatory statements in the forum that it targeted. In doing so, the Motion ignores the Aquarium's significant contacts with Maine relating to those statements.

Before publishing these statements, the Aquarium engaged with Maine-based parties, including Plaintiff MLA, which informed the Aquarium no data existed to support its planned statements. After publication, the Aquarium took affirmative steps to ensure that it disseminated its false statements throughout Maine, including direct engagement with national and local Maine news outlets. The Aquarium obtained pledges from businesses that buy and sell seafood in Maine not to deal in "red-listed" seafood, and those businesses stopped carrying Maine lobsters following the Aquarium's publications. And, pursuant to a license that the Aquarium obtained from the State of Maine, the Aquarium has been using its defamatory publications to solicit donations from readers in Maine. In these circumstances, it is reasonable and foreseeable that the Aquarium should have to defend its false statements about Maine lobster fishing in a Maine court.

The Supreme Court's decision in *Calder v. Jones,* which the Motion ignores, confirms that Maine has jurisdiction over the Aquarium in this action. In *Calder*, like here, an out-of-state defendant interviewed persons in the state where plaintiff lived and conducted business, and then published defamatory statements about plaintiff in that forum. That was sufficient to subject the publisher to jurisdiction in the state that was the focal point of plaintiff's injuries.

Venue Transfer. No basis exists to change venue in this action. The primary consideration in a venue analysis is the plaintiff's choice of forum: the District of Maine. Maine courts are in the best position to apply Maine law which governs this action. And Maine courts have a strong interest in adjudicating a defamation claim by Maine residents based on falsehoods about Maine's signature product. The Aquarium's invocation of the "first-filed" doctrine is meritless because there is no other lawsuit pending between any Plaintiff and the Aquarium.

For these reasons, and those below, the Motion should be denied in its entirety.

**FACTS RELEVANT TO THIS MOTION**

Plaintiffs are businesses and trade associations whose work centers on the Maine lobster fishery. Compl. ¶¶ 14-18. The Maine lobster fishery is a mainstay of Maine's coastal economy, providing jobs for thousands of Maine residents. *Id*. ¶¶ 2-5, 25. By law, Maine lobstermen operate as small businesses, many of which have been family-owned for generations. *Id*. ¶¶ 5, 18.

Maine lobstermen have for years modified their fishing practices to ensure the protection of the North Atlantic right whale from entanglement with lobster gear, including: the use of sinking lines to remove nearly 30,000 miles of rope from the water; requiring more traps per buoy line, thus removing 3,000 more miles of rope; and the incorporation of weak links on rope that break away if a whale swims into them. *Id.* ¶¶ 6, 29–33. Since 2021, Maine lobstermen took additional steps to protect right whales by closing a large portion of the fishing grounds during part of the year, reducing the number of buoy lines by requiring more traps per line, and mandating the use of weak ropes that break at a force of 1,700 pounds. *Id.* ¶ 32.

The Maine lobstermen's efforts have succeeded. There has not been a documented

entanglement of a right whale in Maine lobster gear since 2004. *Id.* ¶ 31. Nor is there evidence that any right whale has *ever* been seriously injured or killed by Maine lobster gear. *Id.*

Right whales are rarely found in Maine lobster-fishing grounds. The whales' migratory patterns have shifted north due to climate change and food availability. Canadian waters are far more dangerous, as they contain thicker ropes used for snow crab traps. Since 2010, most documented right whale entanglements have occurred in Canadian waters or are attributed to Canadian gear. *Id.* ¶¶ 53-57.

The Aquarium is based in California and runs the "Seafood Watch" program, a self-appointed authority on environmental sustainability that rates various fisheries and resources. *Id.* ¶¶ 34–38. The Aquarium represents to the public that Seafood Watch's findings are backed by a "rigorous, transparent, science-based process." *Id.* ¶ 38. Through Seafood Watch, the Aquarium influences commercial and consumer decisions about which seafood varieties to purchase and which to avoid. *Id.* ¶ 80. The Aquarium encourages businesses to "partner" with Seafood Watch and to "pledge" to follow its recommendations. *Id.*

The Aquarium is licensed to solicit charitable donations in Maine. *See* **Opp. Ex. 1**. Every page on Seafood Watch's website has a "Donate Now" link at the bottom soliciting donations. *See, e.g.*, Compl. Ex. 1 ("Sept. 5 Press Release").

In or around 2014, the Aquarium assigned a "yellow" rating to Maine-caught lobsters, describing them as "good alternatives." Compl. ¶¶ 44–45. In or around February 2020, Plaintiff MLA learned that the Aquarium planned to downgrade its rating of Maine lobsters. MLA and other parties from Maine told the Aquarium it based its conclusions on unreliable information. They presented more current and accurate data, including the facts described above, showing the Maine lobster fishery's unblemished record of protecting right whales. Compl. ¶¶ 11, 76.

The Aquarium disregarded the extensive evidence presented by MLA and other experts. In September 2022, the Aquarium launched an aggressive media campaign directed at the Maine lobster fishery and reached into Maine to amplify its impact there. On September 5, 2022, the

Aquarium, claiming it reviewed "all available scientific data," published a Press Release announcing a downgrade of the Maine lobster fishery's rating from "yellow" to "red" due to "significant risks of entanglement," "lack of timely, effective management necessary to mitigate entanglement," and because some fisheries "use gear with vertical lines known to entangle" right whales. Sept. 5 Press Release; Compl. ¶ 47.

On September 6, 2022, the Aquarium released the Seafood Watch American Lobster Report. Compl. Ex. 2 (the "Report"). The Report assigned a red rating to Maine-caught lobster, and told businesses and consumers to "avoid" and "take a pass" on Maine lobster because it is "caught or farmed in ways that harm other marine life or the environment." *Id.* at 4; Compl. ¶ 42, 49, 50–51. That same day, the Aquarium's Vice President of Global Ocean Initiatives, Jennifer Dianto Kemmerly, told a national news outlet that consumers' "appetite for seafood is driving a species to extinction." *Id.* ¶ 52. On September 8, 2022, Kemmerly repeated this statement to a local news station in Boston. *Id.* ¶ 82 n.48 (video in link).

On September 16, 2022, the Aquarium issued a press release stating that "each fishery using [vertical lines] is putting [the right whale] at risk of extinction." Compl. ¶ 66 n.44 ("Sept. 16 Press Release"). On September 29, 2022, Kemmerly spoke to regional news outlet New England Cable News and repeated for broadcast in Maine the claim that lobster consumption was driving a species to extinction.[1] In another Press Release on October 5, 2022 (the "Oct. 5 Press Release), the Aquarium stated the Maine lobster fishery "pose[s] a high risk of harm to marine life or the environment."[2] In December 2022, Kemmerly gave a lengthy interview to Down East, a Maine-

---

[1] *See* David Guildford, *Maine leaders react to 'absurd' Seafood Watch red list on lobster*, NBC NEWS CENTER MAINE, Sept. 29, 2022, https://www.newscentermaine.com/article/money/business/maine-leaders-stew-over-seafood-watch-red-list-lobster-industry-right-whale-regulations-protections-lobstermen-environment/97-d718ea08-3e2d-4b07-97a1-08ecebe897ca (reporting that Kemmerly told NECN news that "no one wants their appetite for seafood to drive a species to extinction."). NECN is available only in Maine and five other northeastern states.

[2] *See* Compl. ¶ 43 n.27, *Answers to frequently asked questions about Seafood Watch's latest*

based magazine focused on Maine issues.[3]  These statements and others are referenced here together as the "Statements," and form the basis for Plaintiffs' defamation claims.

The Aquarium did not direct its Statements to any governmental body.  The Aquarium published its Statements directly to the general public.  The target audiences were prospective purchasers of Maine lobster.  *See* Report at 3 ("The program's goals are to raise awareness of important ocean conservation issues and empower seafood consumers and businesses to make choices for healthy oceans."); *id.* at 4 (telling readers to "Buy first," "Buy, but beware," or "Take a pass" on seafood products).  *See also* Compl. ¶ 36 n.23 ("The Monterey Bay Aquarium Seafood Watch program helps consumers and businesses make choices for a healthy ocean.").[4]

All understood the Statements to refer to Maine lobstermen (including Bug Catcher and the members of MLA and MCFA), and all resellers of lobsters harvested in the Gulf of Maine and Georges Bank (including BML and Atwood).  A September 8, 2022 letter from Maine elected officials condemned the Aquarium for the "accusation that *Maine lobstermen* are to blame for the troubles of the North Atlantic right whale."  Declaration of Jennifer Dianto Kemmerly ("Kemmerly Decl.") Ex. A (emphasis added).  The public understood that the Report asserted science-based facts about the impact of Maine lobster gear on right whales.  *See infra* Part IV.C and n.16.

The Aquarium's Statements injured all who harvest and sell Maine lobsters, including Plaintiffs.  Soon after the Aquarium published the Statements, many businesses and consumers followed the Aquarium's recommendation and stopped buying Maine-caught lobster, including from Maine retail locations.[5]  Overall consumer demand for Maine-caught lobsters decreased after

---

*assessments for fisheries using gear that pose significant risk to the endangered North Atlantic right whale*, Monterey Bay Aquarium, October 5, 2022 (updated Mar. 2023), https://www.montereybayaquarium.org/newsroom/pressreleases/seafood-watch-assessments-faqs-north-atlantic-right-whale.

[3] *See* Kathyrn Miles, *How did Gulf of Maine lobster get canceled?*, DOWN EAST MAGAZINE, Dec. 2022, https://downeast.com/issues-politics/how-did-gulf-of-maine-lobster-get-canceled/.

[4] *Collaborations*, Seafood Watch, https://www.seafoodwatch.org/collaborations.
[5] *Whole Foods to stop selling Maine lobster*, WABI Maine News, Nov. 22, 2022,

September 2022, driving down the market price. Compl. ¶ 84. Plaintiffs individually suffered losses of income and reputational damage from the Aquarium's Statements. *Id.* ¶¶ 83, 85, 90.

## ARGUMENT

## POINT I

### THIS COURT HAS PERSONAL JURISDICTION BECAUSE THE AQUARIUM REACHED INTO MAINE TO DEFAME MAINE RESIDENTS AND COULD REASONABLY FORESEE HAVING TO DEFEND ITSELF IN A MAINE COURT.

A defendant is subject to specific personal jurisdiction when its contacts with a forum are purposeful and have sufficient nexus with the plaintiff's claims that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021). As the Aquarium acknowledges, the Court should apply a "prima facie" standard to the Aquarium's arguments for dismissal under Rule 12(b)(2). *See* Def. Mem. at 11. Plaintiffs' allegations more than suffice to show that the Aquarium intended to harm Maine-based lobster businesses by spreading falsehoods about Maine lobster fishing practices.

**A. The Supreme Court's Decision in *Calder v. Jones* Confirms That the Aquarium is Subject to Specific Personal Jurisdiction in Maine.**

In seeking to avoid personal jurisdiction, the Motion ignores the controlling Supreme Court decision of *Calder v. Jones*, 465 U.S. 783 (1984). *Calder* establishes that a non-resident defendant sued for defamation is subject to personal jurisdiction in the forum where it directed its defamatory publication and intended to harm the plaintiff. *Id.* at 791.

In *Calder*, a celebrity who lived and worked in California sued an out-of-state publisher in California court for defamation based on statements in defendant's nationally-distributed publication that the celebrity's drinking rendered her unable to fulfill her professional obligations. The article cited to interviews with persons located in California. Applying an "effects test," the Supreme Court asked whether the forum state was the focal point of the defamatory material and

---

https://www.wabi.tv/2022/11/22/whole-foods-stop-selling-maine-lobster/; *see also* Compl. ¶¶ 12, 82, 84.

the locus of plaintiff's alleged injuries, including reputational harm. *Id.* at 783–84. The Court held that specific personal jurisdiction existed because defendant's conduct was "calculated to cause injury" to the plaintiff in her home state. *Id.* at 791. *See also id.* at 812 (finding that defendant had "expressly aimed" its tortious actions at the forum by publishing an article it knew would have a "potentially devastating" effect on plaintiff, and knew the "brunt of the injury" would be felt in the state where she lived and worked). The combination of injury in the forum and defendants' intentional direction of harmful activity at the forum sufficed to establish personal jurisdiction.

Plaintiffs meet those twin requirements here. As in *Calder*, the Aquarium's Statements focused on the forum where Plaintiffs reside and do business. *See, e.g.*, Compl. ¶¶ 23, 45-59, 66-73, 94-95. The Aquarium did not merely talk about Maine businesses; it reached into Maine as part of its defamatory scheme. The Aquarium cited Maine-based sources to support the credibility of its Statements. *See* Report at 68, 72 (citing University of Maine publication); 69 (citing Maine Dept. of Marine Resources publication). The Aquarium reached into Maine to contact and solicit comments from sources, including MLA, and then, to bolster the Statements' credibility, broadcasted that it had invited public comment before issuing its red-listing.[6] The Aquarium's Vice President delivered the defamatory message directly to Maine and New England-based outlets. *See supra* at nn.1, 2. And other Maine outlets predictably republished the Statements.[7]

The Aquarium knew that its Statements could cause substantial economic harm to the

---

[6] *See* Oct. 5 Press Release ("To give external stakeholders an opportunity to share additional research and data points, our process includes a public comment period. We reviewed all the comments we received as part of the assessment process. The Seafood Watch program also gathered input from scientific, government, industry, and conservation experts, and through a public comment period."). *See also* Declaration of Patrice McCarron ("McCarron Decl.") at ¶¶ 3–18; Kemmerly Decl. ¶ 4 (describing the Aquarium's solicitation of comments from MLA and the Maine Department of Marine Resources).

[7] *See, e.g.*, Jordan Andrews, *Seafood group 'red lists' lobster over risk to right whales*, PORTLAND PRESS HERALD, Sept. 7, 2022, https://www.pressherald.com/2022/09/06/seafood-sustainability-group-red-lists-lobster/; Leela Stockley, *Maine lobster lands on a national list of seafood to avoid due to threat to right whales*, Bangor Daily News, Sept. 6, 2022, https://www.bangordailynews.com/2022/09/06/business/maine-lobster-seafood-watch/.

Plaintiffs. In an email to MLA regarding the Report, an Aquarium officer acknowledged: "The possible results of this assessment and the impact that it may have is not lost on us."[8] Indeed, the Aquarium specifically requested that consumers cause Plaintiffs economic harm by not purchasing their lobsters. Thus, as in *Calder,* the Aquarium "expressly aimed" the Statements in Maine, knew the Statements would have a "potentially devastating" effect on Plaintiffs, and knew the "brunt of the injury" would be felt in Maine. *See Calder*, 465 U.S. at 812. In these circumstances the Aquarium could reasonably anticipate it would have to answer for its Statements in a Maine court.

**B. The Aquarium Intentionally Directed Defamatory Statements at Maine and Enjoyed the Protection of Maine Law.**

The facts here also satisfy the First Circuit's test for specific personal jurisdiction. *See Henderson v. Laser Spine Inst., LLC*, 815 F. Supp. 2d 367, 368 (D. Me. 2011) (Woodcock, J.) (analyzing specific personal jurisdiction by assessing relatedness, purposeful availment and reasonableness) (citations omitted).

**1. The Claims Are Related to the Aquarium's Contacts With Maine.**

The "relatedness" element for specific jurisdiction has a "flexible, relaxed standard." *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994). A plaintiff satisfies the relatedness prong by showing "a nexus between its claims and [the defendant's] forum-based activities." *A Corp. v. All American Plumbing, Inc.*, 812 F.3d 54, 59 (1st Cir. 2016). "In tort, a claim generally 'arises out of' a defendant's forum contacts where those contacts are a material part of plaintiff's proof." *Henderson*, 815 F. Supp. 2d at 368.

The relatedness element is satisfied here. Plaintiffs' defamation claims arise directly from the Aquarium's publication of the Statements in Maine about Plaintiffs and their activities in Maine, as well as the Aquarium's encouragement of retailers and consumers in Maine not to buy Plaintiffs' products. *See* Compl. ¶¶ 8, 23, 47-52.

Contrary to the Aquarium's arguments, *see* Def. Mem. at 14, the Aquarium's aggressive

---

[8] McCarron Decl. Ex. A (May 15, 2020 email between MLA Executive Director Patrice McCarron and Monterey Bay Aquarium Fisheries Program Manager Sam Wilding).

media campaign exceeded merely posting the Statements on its website.  The Aquarium engaged with Maine residents before the Statements were published.  The Aquarium received evidence from MLA and other Maine residents showing its planned Statements were false and nonetheless chose to publish the Statements.  *See supra* n.6 and accompanying text.  The Aquarium also ensured that its Statements had an impact in Maine, speaking directly to Maine-based media outlets and issuing press releases in Maine and elsewhere to ensure that the media more widely broadcast the defamatory Statements. *See supra* nn.1–3.

The Aquarium is wrong to suggest that nothing in the Motion record shows that any Maine resident read the Statements.  *See* Def. Mem. at 14.  The Aquarium volunteers on page 1 of its brief that numerous Maine public officials "demanded that the Aquarium reverse the red rating" after it published the Statements.  Def. Mem. at 1.  One news article, published three days after the Aquarium released its Report, includes video footage of a representative from the Maine Lobster Marketing Collaborative ("MLMC") reacting directly to the publication. [9]  MLMC is a Maine-based organization that supports the Maine lobster industry.[10]  And its public response convincingly shows that the Aquarium's Statements were read in Maine.  *See* n. 9.

For these reasons, the Aquarium's reliance upon *Scottsdale Cap. Advisors v. Deal LLC*, 887 F.3d 17 (1st Cir. 2018) (cited in Def. Mem. at 14–15), is misplaced.  In *Scottsdale*, there were only two subscribers to defendant's publication in the forum state, and no evidence existed that either had read the statements at issue.  *See id.* at 21–22.  Here, the Statements spread throughout Maine via popular online and print media outlets with wide Maine audiences, including NBC News

---

[9] *See* Compl. at ¶ 82 n.48 (*Retailers Pull Lobsters From Menus After 'Red List' Warning*, NBC NEW, Sept. 8, 2022, https://www.nbcnews.com/news/us-news/retailers-pull-lobster-menus-red-list-warning-rcna46886). This same video reveals that the Aquarium's Vice President Julie Kemmerly told WBTS news, which broadcasts into Maine from Massachusetts, that consumers' "appetite for seafood" is "driving a species to extinction."

[10] *See* https://lobsterfrommaine.com/.

Center Maine, *see supra* n.1, the Portland Press Herald, *see supra* n.7, and the New York Times.[11]

### 2. The Aquarium Purposefully Availed Itself of the Maine Forum.

The second factor in the First Circuit test is purposeful availment, which examines whether defendant's relevant contact with the forum was voluntary and "of a nature that the defendant could reasonably anticipate being haled into court there." *Rodriguez-Rivera v. Allscripts Healthcare Sols.*, Inc., 43 F.4th 150, 163 (1st Cir. 2022). Publication of statements in a forum amounts to purposeful availment where the defendant intended that its statements would exploit the market within the forum. *See Noonan v. Winston Co.*, 135 F.3d 85, 90–91 (1st Cir. 1998) (applying *Calder* effects test) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

The facts belie the Aquarium's claims that it did not "deliberately exploit a market in Maine," Def. Mem. at 16 & Kemmerly Decl. ¶ 5. The Aquarium's Statements targeted the fishing practices of Maine lobstermen, instructing consumers to avoid purchasing their lobsters. As the Aquarium intended, the public stopped buying from Plaintiffs in Maine. Compl. ¶¶ 12, 82, 83.

The Aquarium also used Maine sources for its article, boasted that it sought comments from MLA and other Maine-based lobster industry participants, and communicated about the Statements with media outlets that broadcast into Maine. *See supra* nn.1, 3, 6.

The Aquarium also reached into Maine with its defamatory publications to solicit money. On the Aquarium's "Seafood Watch" website, published to readers in Maine and elsewhere, the Aquarium prominently features a clickable "Donate Now" button, soliciting Maine readers to support the work of Seafood Watch financially through an interactive webpage. *See* Sept. 5 Press Release; **Opp. Ex. 2**. This button appears on the Aquarium's press releases containing some of the Statements at issue. The Aquarium engaged in these charitable solicitations pursuant to a license that it applied for and obtained from Maine. *See* **Opp. Ex. 1**.

### 3. It Is Reasonable to Subject the Aquarium to Personal Jurisdiction in

---

[11] *See* Annie Roth, *To save whales, don't eat lobster, watchdog group says*, NY TIMES, Sept. 13, 2022 (updated Oct. 14, 2022), https://www.nytimes.com/2022/09/13/science/lobsters-right-whales-maine.html.

**Maine Concerning Its Statements About Maine Lobster Fishing.**

Because personal jurisdiction in Maine over the Aquarium in this action is entirely reasonable, Plaintiffs easily satisfy the third step in the First Circuit's analysis. The reasonableness inquiry considers several "gestalt factors," including: (1) defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *See Astro-Med, Inc. v. Nihon Kohden Am.*, 591 F.3d 1, 10 (1st Cir. 2019). The Aquarium would have to "present a compelling case" that these factors render jurisdiction unreasonable. *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 220 (1st Cir. 1989).

The Aquarium has not made any "compelling case." The Aquarium would not suffer an unusual burden to appear in federal court in Maine. The mere inconvenience of litigating outside one's home state does not suffice. *Henderson*, 815 F. Supp. 2d at 378. Maine has a strong interest in adjudicating this dispute. Maine can provide convenient and effective relief. And Maine has a substantial interest in promoting substantive social policies—as reflected in Maine's defamation law and legislative policy against business disparagement by means of misrepresentation, *see* 10 M.R.S.A. § 1212(1)(H). Although Maine and California may share a sovereign interest in prohibiting defamation, that hardly renders personal jurisdiction in Maine unreasonable.

### C. The Authorities Cited by the Aquarium Are Inapposite.

The Aquarium's brief cites to authorities that either confirm the Aquarium is subject to personal jurisdiction in this action, or are distinguishable from this case. For example, *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 35 (1st Cir. 2010) (cited in Def. Mem. at 11, 13, 16), addresses general jurisdiction, not specific jurisdiction. And notably, *Cossaboon* observed that jurisdiction would exist over a defendant whose website included "interactive features" that facilitated transactions with and targeted in-state residents. *See id.* The Aquarium's "Donate Now" button on its press releases targeting the Maine lobster fishing industry satisfies the *Cossaboon* standard.

Many of the other cases cited by the Aquarium are distinguishable because the defendants

lacked any contact at all with the forum state.  *See, e.g., Motus, LLC v. Cardata Consultants, Inc.*, 23 F.4th 115 (1st Cir. 2022) (finding no personal jurisdiction where out-of-state defendant did not initiate contact with any forum residents) (cited in Def. Mem at 16); *Broadvoice, Inc. v. TP Innovations LLC*, 733 F. Supp. 2d 219, 226 (D. Mass. 2010) (out-of-state defendants "did nothing to incite residents of Massachusetts") (cited in Def. Mem at 16–17).  Here, by contrast, the Aquarium *promoted* its website and the Statements to Maine media, solicited and received feedback from Maine residents, boasted about its use of Maine sources to reach its conclusions, and purposefully disseminated the Statements through Maine media channels.  *See supra* nn.1, 3, 6 and accompanying text.  *See also Gentle Wind Project v. Garvey*, No. 04-103-P-C, 2005 U.S. Dist. LEXIS 261, at *27 (D. Me. Jan. 10, 2005) (cited in Def. Mem at 16–17) (noting that no plaintiff resided in Maine and "there was no evidence that the defendant specifically solicited comments or questions from viewers in the forum state or advertised in the forum state").  A more analogous precedent is *Cohen v. Zaic*, No. cv-06-236, 2007 Me. Super. LEXIS 105 (May 23, 2007).  In *Cohen*, the court found a non-resident defendant sued for defamation was subject to personal jurisdiction in Maine because "the intent behind [the website's comments] was to harm [plaintiff's] professional reputation and her online, Maine-based business."  *Id* at *10.

Accordingly, the Aquarium is subject to personal jurisdiction in Maine in this action.[12]

## POINT II

### THERE IS NO BASIS TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF CALIFORNIA.

The Aquarium's request to transfer this action to the Northern District of California under 28 U.S.C. § 1441 is meritless.  A court may transfer an action to another district where it might have been brought, where such transfer would serve "the interests of justice" and "the convenience of parties and witnesses."  *See* 28 U.S.C. § 1404(a).  In assessing the "interest of justice," courts

---

[12] If the Court has any doubts whether Plaintiffs have made a prima facie case that personal jurisdiction exists in this action, Plaintiffs respectfully refer the Court to their Motion for Jurisdictional Discovery, filed concurrently with this opposition.

14

consider public factors such as judicial economy, the district court's familiarity with the governing law, and the local interest in deciding local controversies at home. *Johnson v. VCG Holding Corp.*, 767 F. Supp. 2d 208, 212 (D. Me. 2011) (Woodcock, J.). In assessing "the convenience of parties and witnesses," courts consider private factors like the plaintiff's forum preference, where the claim arose, and the relative ease of access to sources of proof. *Id.* The burden of proof rests with the party seeking transfer. *See Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000).

In the First Circuit, "there is a strong presumption in favor of the plaintiff's choice of forum." *Id.* This factor weighs heavily against the Aquarium's requested transfer.

The public factors also weigh heavily against transfer. It is indisputable that Maine law applies here, including Maine's defamation law and anti-SLAPP statute. As a result, a Maine court will be more familiar with the governing law. *See Johnson*, 767 F. Supp. 2d at 217 ("[T]he District of Maine is more familiar with Maine law and in a better position to apply it.").

Maine has a considerable interest in the outcome of this action because the Aquarium's defamation attacks the business practices of Maine residents and directly impacts a signature Maine industry. *See* Compl. ¶¶ 2–4; *see also Canales v. Univ. of Phoenix, Inc.*, No. 2:11-cv-00181-JAW, 2012 U.S. Dist. LEXIS 88930, at *15–16 (D. Me. June 27, 2012) (Woodcock, J.) (denying transfer where "the state of Maine [had] an undoubted interest in the outcome of the [] litigation" because the Plaintiff was a Maine resident).

The Aquarium notes that its employees reside in California (though not necessarily the Northern District) and its documents are located there, *see* Def. Mem. at 22, but this hardly warrants transfer. There are five Plaintiffs and only one Aquarium, and the Plaintiffs' witnesses and documents are located in Maine. *See* McCarron Decl. ¶ 2; Declaration of John Petersdorf ("Petersdorf Decl.") ¶ 2; Declaration of Corey Thompson ("Thompson Decl.") ¶ 2; Declaration of Ben Martens ("Martens Decl.") ¶ 2; Declaration of Gerald Cushman ("Cushman Decl.") ¶ 2.

In any case, the presence of witnesses and documents outside the forum state is routine in federal diversity jurisdiction cases and does not tilt in favor of forum transfer. Courts will not

15

transfer a case merely to "shift the inconvenience from one party to the other." *Banjo Buddies, Inc. v. Renosky*, 156 F. Supp. 2d 22, 26 (D. Me. 2001) (citation omitted). And in the age of electronic discovery, the location of documents has little impact on the convenience of reviewing and producing them. *See Johnson*, 767 F. Supp. 2d at 216 (noting that the "availability of documents" factor "seems like a holdover from a time when businesses kept important records, including payroll records, in paper"); *see also United States v. Ortiz-Islas*, No. 1:12-cr-00125-JAW, 2013 U.S. Dist. LEXIS 34730, at *22 (D. Me. Mar. 13, 2013) (Woodcock, J.) (denying forum transfer motion even though defendant's relevant documents were located outside Maine).

Finally, the Aquarium's efforts to invoke the "first-filed" doctrine grossly misstate the law. *See* Def. Mem. at 20–22. Under the "first-filed" doctrine, "[w]here identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision." *Coady*, 223 F.3d at 11 (citing *Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987)).

No "first-filed" action exists here. The Aquarium points to an action filed by Massachusetts fishing businesses in the Eastern District of Louisiana (the "Louisiana Action"), which the Aquarium hopes will be transferred to the Northern District of California. The Louisiana Action is hardly identical to this case. None of the Plaintiffs here is a party in the Louisiana Action, and the injuries alleged in the Louisiana Action are entirely separate from the harms suffered by Plaintiffs here. This action asserts common-law defamation under Maine law; the Louisiana Action claims violation of a Louisiana statute prohibiting disparagement of aquacultural products and interference with proprietary rights. No precedent exists for consolidation or joint venue transfer of such different actions. *See Coady*, 223 F.3d at 5 (actions consolidated involved exact same parties); *Cianbro*, 814 F.2d at 8 n.2 (same). *See also TPM Holdings, Inc. v. Intra-Gold Indus.*, Inc., 91 F.3d 1, 4 (1st Cir. 1996) (stating that first-filed rule applies where "the overlap between the two suits is nearly complete"); *N.Y. Wiping & Indus. Prod. Co. v. Rocky Brands, Inc.*, No. 09-1237 (JAF), 2009 U.S. Dist. LEXIS 77827, at *8 (D.P.R. Aug. 31, 2009) (denying transfer where defendants

16

failed to prove the "essential element" that the first-filed and second-filed claims were "identical").

**POINT III**

**MAINE'S ANTI-SLAPP STATUTE DOES NOT APPLY TO THIS CASE BECAUSE THE AQUARIUM WAS NOT EXERCISING ITS RIGHT TO PETITION.**

Resolution of a special motion to dismiss under Maine's anti-SLAPP statute involves a two-step inquiry. First, the Court must determine whether this lawsuit challenges the Aquarium's exercise of its right to petition the government. *See Thurlow v. Nelson*, 2021 ME 58, 263 A.3d 494. The Aquarium bears the burden of proof on this issue, and the Court resolves this issue as a matter of law. *See id.* If the challenged conduct was anything other than petitioning the government, the special motion should be denied without further analysis. *See, e.g.*, *Gaudette v. Mainely Media, LLC*, 2017 ME 87, ¶ 18, 160 A.3d 539. Only if the defendant proves its conduct was petitioning activity does the Court move on to examine whether the action is the type of frivolous lawsuit that the anti-SLAPP statute intends to deter, whether any of the challenged actions were devoid of any reasonable factual support or any arguable basis in law, and whether plaintiff suffered actual injury. *Thurlow*, 2021 ME 58, ¶ 12, 263 A.3d 494. Here, the Aquarium fails at the first step, and the Court need not go further; but in any case, this action would also survive scrutiny under the subsequent step.

A. **The Aquarium's Statements Were Aimed at Consumers and Businesses and Were Not Designed to Influence Government.**

Maine's anti-SLAPP statute has a narrow focus. While other states' anti-SLAPP laws protect broad categories of speech, Maine's statute applies only where a defendant is sued for petitioning the government—that is, "expression directed to the government seeking redress of a grievance." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011); *see also Mainely Media*, 2017 ME 87 ¶ 17, 160 A.3d 539.

In the anti-SLAPP context, Maine courts do not interpret petitioning the government to include other kinds of speech. *See Mainely Media*, 2017 ME 87, ¶¶15–17, 160 A.3d 539 ("Maine's anti-SLAPP statute is not applicable to newspaper articles unless those articles constitute the

17

newspaper petitioning on its own behalf," as opposed to "documenting others' exercise of their right to petition.").

This Court has recognized the difference between the right to petition the government and other protected speech, finding that the anti-SLAPP statute did not apply to statements made about a political adversary during a campaign. *See Filler v. Hancock Cty.*, 1:15-cv-00048-JAW, 2016 US Dist. LEXIS 10777 (D. Me. Jan. 27, 2016), at \*99–101 (Woodcock, J.). This Court rejected the *Filler* defendant's arguments that the statements at issue constituted "petitioning" activity because they related to a judicial proceeding, noting that the statements were directed to the public and not to the court in that proceeding. *Id.*

The Motion argues for the same expansive reading of the "right to petition" that this Court rejected in *Filler*. *See* Def. Mem. at 24. The Aquarium has not shown that the *purpose* of the Statements was to bring about governmental action. Instead, the Aquarium argues that "petitioning activity" should include statements "in connection with" an issue pending before a government body, or "reasonably likely" to affect consideration of such an issue or enlist participation in the consideration of such an issue. This argument is based on a broad reading of the statute's language that disregards well-established precedent. Further, to read the statute as the Aquarium does would significantly expand the scope of Maine's anti-SLAPP laws, something a federal court should avoid when sitting in diversity. *See CVS Pharmacy, Inc. v. Lavin,* 951 F.3d 50, 58 (1st Cir. 2020) ("[W]e must 'take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts.'") (citation omitted).

Maine's Law Court has not read the anti-SLAPP statute as broadly as the Aquarium proposes and has instead focused on the purpose of the speech. In *Mainely Media*, a newspaper's reports on others' petitioning activity could have encouraged readers to participate in public debate on that issue, but did not directly call readers to agitate with the government or otherwise evince a purpose to affect government action. As a result, the newspaper reports were held not to qualify as petitioning activity. *See Mainely Media*, 2017 ME 87, ¶ 17, 160 A.3d 539. Similarly, in *Filler,* this

18

Court declined to find petitioning activity where the purpose of the speech was not to encourage participation in public debate on a judicial issue or affect government consideration of that issue. *See Filler*, 2016 US Dist. LEXIS 10777, at *100.

Here, the record establishes that the express purpose of the Aquarium's Statements was to convince consumers and businesses not to buy Maine lobster. The Aquarium's speculation that these Statements to the public could conceivably impact a governmental body's decision-making hardly transforms the Statements into petitioning activity protected by the anti-SLAPP statute.

Similarly, the Statement that "Canadian and U.S. management measures … do not go far enough to mitigate entanglement risks and promote recovery" of the right whale, Def. Mem. at 25, does not qualify as "petitioning the government" because it was not directed to a governmental body to effect change. The Aquarium's expression of dissatisfaction with existing regulations is not the same as petitioning the U.S. and Canadian governments to change them.

The Aquarium does not suggest that its press release was targeted at relevant U.S. or Canadian regulators, or that it asked those regulators to change their management measures. Instead, the Aquarium points to the political activities of others, including Plaintiff MLA, that *were* meant to influence government policy. *See* Def. Mem. at 26 & Ex. 13 (MLA's 2021 lawsuit against the National Marine Fisheries Service ("NMFS")); Kemmerly Decl. Ex. C (2019 letter to Maine Senator Susan Collins from third parties). But the unrelated conduct of third parties does not bestow anti-SLAPP protection on the Aquarium's Statements to consumers and businesses. *See Thurlow*, 2021 ME 58, ¶ 26 n.7 (noting that neither the language nor history of the anti-SLAPP statute shows an intent to "deprive litigants of common law causes of action simply because the defamation was committed *in the context of* petitioning activity") (emphasis added).

The Aquarium does not cite any Maine precedent that would support treating its recommendation to consumers as "petitioning the government" for anti-SLAPP purposes. The Supreme Court's decision in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 899-900 (1982) (cited in Def. Mem. at 1, 26), is inapposite because it did not involve any anti-SLAPP statute, let

19

alone Maine's.  In *Claiborne Hardware*, individuals and organizations seeking racial equality boycotted white-owned businesses for seven years specifically to influence government action on desegregation, public improvements, and policing. 458 U.S. at 902.  Among other things, the *Claiborne Hardware* plaintiffs prepared and presented a "petition for redress of grievances." *Id.* at 898.  The Court held that these primarily political motivations "differentiate[d] [the] case from a boycott organized for economic ends, for speech to protest racial discrimination is essential political speech lying at the core of the First Amendment." *Id.* at 914.

 *Claiborne Hardware* does not hold that all boycotts are petitions to the government. Rather, the decision focused on evidence of the intentions behind the boycott.  Here, the Aquarium presented no evidence that the intention behind its Statements was to change governmental policy. Thus, *Claiborne Hardware* would not support anti-SLAPP protection here.  *See Clay Corp. v. Colter*, No. NOCV2012-01138, 2012 WL 6554752, at \*3 (Mass. Super. Dec. 11, 2012) (stating that *Claiborne Hardware* does not extend anti-SLAPP protection to "boycotts and picketing . . . not aimed at directly or indirectly influencing government action," including "speech that is intended to achieve a purely commercial result").

 Finally, it is worth noting that Plaintiffs are not suing the Aquarium for initiating a boycott of lobsters.  This lawsuit is for defaming Plaintiffs' business by making false statements about how those lobsters are caught.  Nothing in *Claiborne Hardware* suggests that boycotts are a shield for defamatory conduct.

 The other anti-SLAPP boycott cases cited by the Aquarium are also off base.  In *Shire City Herbals, Inc. v. Blue*, No. 15-30069-MGM, 2016 U.S. Dist. LEXIS 62888 (D. Mass. May 12, 2016) (cited in Def. Mem. at 26–27), defendant was engaged in boycott activities "to unite the herbalist community behind a movement to have Plaintiff's [trademark] canceled" by the U.S. Trademark Trial and Appeal Board—which is a petition for action by a regulatory body.  *Id.* at \*5. A more apt precedent is *Hearts with Haiti, Inc. v. Kendrick*, 2019 ME 26, 202 A.3d 1189, where the Maine Supreme Court denied a motion to dismiss under the anti-SLAPP statute.  In *Hearts with*

*Haiti*, the defendant "urge[d] benefactors not to donate to [the plaintiff] and pressure[d] third parties not to do business with [the plaintiff]." *Id.* ¶ 13. Similarly, the Aquarium's Statements here were "specifically aimed" at third parties, including Plaintiffs' business partners, and did not "request[] action by the government to address [its] concerns." *Id.* ¶¶ 12–13.

Finally, even if some fraction of the Aquarium's Statements did amount to petitioning activity, the Court should still deny the motion to dismiss. The anti-SLAPP statute is meant to protect against meritless actions. Where only a small portion of a defendant's string of defamatory conduct possibly includes petitioning activity, but a "substantial majority" does not, protections of the anti-SLAPP statute are not applicable. *Hearts with Haiti*, 2019 ME 26, ¶ 14, 202 A.3d 1189 (affirming denial of anti-SLAPP motion despite acknowledging that some of defendant's statements "could be considered petitioning activities").

### B. Plaintiffs Have Made a Prima Facie Case That the Statements Were Intentionally False and Caused Actual Injury.

Because this case does not implicate petitioning activity, the Court need not consider the second step of the anti-SLAPP analysis. But in any event, Plaintiffs more than satisfy this step.

In assessing the second step of the anti-SLAPP analysis, the Court assumes the well-pled allegations in the Complaint are true and gives Plaintiffs the benefit of every reasonable inference. *See Thurlow*, 2021 ME 58, ¶ 16, 263 A.3d 494. Plaintiffs' prima facie standard is "low" and "does not depend on the reliability or credibility of the evidence." *Nader v. Me. Democratic Party* ("*Nader I*"), 2012 ME 57, ¶ 34, 41 A.3d 551. If Plaintiffs make their showing, the motion must be denied. *Thurlow,* 2021 ME 58, ¶ 19, 263 A.3d 494.

Here the Aquarium concedes, as it must, that Plaintiffs have pled actual injury. *See* Def. Mem. at 27 (claiming to have established petitioning activity and therefore "the burden shifts to Plaintiffs to show that the exercise of the right of petition was 'devoid of any reasonable factual support or any arguable basis in law'" but not mentioning actual injury). Plaintiffs' plea for monetary damages in the Complaint suffices to meet the actual injury requirement. *See* Compl. ¶¶ 12, 83-90; *see also Schelling v. Lindell*, 2008 ME 59, ¶ 17, 942 A.2d 1226 (requiring party

21

opposing anti-SLAPP motion to show "a reasonably certain monetary valuation of the injury []
suffered"); *Lynch v. Christie*, No. 2:11CV70-DBH, 2012 U.S. Dist. LEXIS 165628, at *23–24 (D.
Me. Nov. 20, 2012) (denying anti-SLAPP motion where the subject of defamatory website
publications claimed a $290 expenditure for counseling, and noting that "weighing the depth of the
injury and its duration will be a matter for the jury").

Accordingly, the only issue in dispute under the second step is whether the Aquarium had a
factual or legal basis for the Statements—which it did not. The Aquarium relies on self-serving
assertions that contradict the well-pled allegations in the Complaint, arguing that Plaintiffs cannot
prove the Statements were false or made intentionally or recklessly, or that the Statements were not
protected opinions. *See* Def. Mem. at 27. These arguments disregard the well-pled allegations in
the Complaint. As detailed in Part IV below, the Complaint alleges that the Aquarium deliberately
misled consumers and businesses to believe that Maine lobstermen are causing harm to right
whales, claiming that it reviewed "all available scientific data," when it ignored the relevant
scientific data and other facts that contradicted its Statements. *See, e.g.,* Compl. ¶¶ 8–10, 67–69;
McCarron Decl. ¶¶ 11–12. Indeed, the Aquarium has admitted there is no proof connecting Maine
lobster gear to any right whale entanglements. Compl. ¶¶ 9–10.

The accompanying declaration of Patrice McCarron further evidences that the Aquarium
knew its Statements were not supported by "scientific data." On several occasions, MLA and other
parties presented evidence to the Aquarium that the Maine lobster fishery was not responsible for
right whale entanglements. McCarron Decl. ¶¶ 6–18; Compl. ¶¶ 11, 76.

If a jury finds that Plaintiffs' allegations are true, Plaintiffs will prevail on their defamation
claim. This is all that Plaintiffs must do to defeat the second step of the anti-SLAPP analysis. *See*
*Nader I*, 2012 ME 57, ¶ 34, 41 A.3d 551.

**POINT IV**

**THE COMPLAINT ALLEGES SUFFICIENT FACTS TO SUPPORT**
**PLAINTIFFS' DEFAMATION CLAIMS.**

22

Plaintiffs have sufficiently pled all elements of their defamation claims: (1) false and defamatory statements pertaining to Plaintiffs; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) defamation per se or special harm. *See Pan Am Systems Inc. v. Atlantic Northeast Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015). None of the Aquarium arguments support dismissal under Rule 12(b)(6).

### A. The Aquarium's Statements Were About Plaintiffs.

False and defamatory statements are actionable if they are "'of or concerning the plaintiff.'" *Robinson v. Guy Gannett Publishing Co.*, 297 F. Supp. 722, 725 (D. Me. 1969) (quoting *Judkins v. Buckland*, 149 Me. 59, 65, 98 A.2d 538 (1953)). As Maine courts have observed, "it is not necessary that the publication on its face mention the plaintiff by name," and it is enough if the plaintiff is identifiable "'by clear implication.'" *Osgood v. C.U. York Insurance Co.*, No. CIV.A. CV-04-568, 2006 WL 1980396, at *5 (Me. Super. June 5, 2006) (quoting *Hudson v. Guy Gannett Broadcasting Co.*, 521 A.2d 714, 715, n. 7 (Me. 1987)).

Here, the Complaint pleads ample facts showing that the Aquarium's Statements were "actually understood as referring" to Plaintiffs, and that this was "the reasonable understanding of the recipient of the communication." *Robinson*, 297 F. Supp. at 726.

In assessing whether "an average reader" would understand the Aquarium's Statements as "of or concerning" Plaintiffs, the Court may consider the fact that actual readers of the Report understood the Statements in this way. *See Gaprindashvili v. Netflix, Inc.*, No. 221CV07408VAPSKX, 2022 WL 363537, at *10 (C.D. Cal. Jan. 27, 2022) ("Plaintiff submits evidence that viewers did in fact interpret the Line as defamatory. This evidence, though not dispositive, supports the allegation that a 'reasonable' viewer would believe the line to be defamatory."). In *Hudson*, the Law Court explained, "[w]ith the focus on the recipient's understanding, the plaintiff logically seeks to establish at least one person's understanding of the broadcast as referring to the plaintiff." *Id.*

Here, the Complaint alleges that the Aquarium's Statements were understood to refer to

23

Plaintiffs and their business. *See* Compl. ¶¶ 52 & nn.29, 84, 90. The Aquarium has not offered the Court any reason to disregard this allegation.

The "of and concerning" issue is fact dependent. Even if this case were at the summary judgment stage (which it is not), the Court could not find for the Aquarium on this issue unless "upon viewing the evidence most favorably to the plaintiff, there exists no genuine issue of fact from which a jury could reasonably find by a preponderance of the evidence that the defendant's publications were of and concerning the plaintiff." *Hudson*, 521 A.2d at 716 (Me. 1987); *see also Lynch*, 2012 U.S. Dist. LEXIS 165628 at *14 n.10 ("[P]laintiff need show only that a single person understood the defamatory statement to be of and concerning him.").

The record shows that recipients of the Aquarium's publications—including the press and general public—recognized that the Aquarium's Statements referred to Maine lobstermen and the Maine lobster industry. The Statements claimed that *all* lobsters sourced from the "Gulf of Maine/Georges Bank" lobster fisheries are harvested in a manner that threatens the lives of right whales. Report at 6 ("Seafood Watch recommends to **Avoid** American lobster caught by trap from Georges Bank and the Gulf of Maine stocks[.]"). The Aquarium stated that "*each* fishery" using vertical lines "is putting [the right whale] at risk of extinction," Sept. 16 Press Release (emphasis added), and that lobster is "caught or farmed in ways that harm other marine life," Report at 4.

These Statements implicate *every* person and business that harvests Maine lobsters. To further identify the Statements' target, the Aquarium sent its Vice President to speak directly to local Maine news broadcasters and publishers. *See supra* nn.1, 3.

These Statements are not only "reasonably capable of being understood" to refer to the Plaintiffs, *they actually were understood in this manner*. For example, because of the Statements, major commercial purchasers stopped buying Maine lobsters from Plaintiffs. Compl. ¶¶ 82–88.

It is immaterial that the Aquarium did not identify Plaintiffs by name. *See* Def. Mem. at 30. The "clear implication" is that *all* Maine lobstermen are killing or causing serious harm to right whales, and *all* businesses that sell Maine lobsters are selling products that kill or cause serious

24

harm to right whales.  Plaintiffs are in those groups.  And Plaintiffs' businesses have been damaged by the Statements to the same degree as if the Aquarium had singled them out by name.  *See Spofford v. Genthner*, 156 Me. 363, 367–68, 165 A.2d 68 (1960) ("An article is no less defamatory because it accomplishes its damaging mission by the use of insinuation.").

Indeed, press coverage confirms that the Aquarium's Statements were understood to implicate all participants in the Maine lobster industry.  For example, the Associated Press reported that the Aquarium's Statements impugned the Maine fishing industry as harming right whales and led retailers to stop selling lobster.[13]  Other prominent media voices, including *Smithsonian Magazine*, *The Guardian*, and *USA Today*, reported that the Statements were about the Maine lobster industry,[14] magnifying the negative impact of the Statements on Plaintiffs.

The response from Maine public leaders also confirms that the Statements were understood to refer to all who catch and sell Maine lobsters.  The Motion includes a public letter from Governor Janet Mills, U.S. Senators Angus King and Susan Collins, and U.S. Representatives Chellie Pingree and Jared Golden, specifically condemning the Aquarium for its "accusation that Maine lobstermen are to blame for the troubles of the North Atlantic Right Whales."  *See* Kemmerly Decl. Ex. A.  The letter also stated that the Aquarium had appointed itself "Judge, Jury and Executioner of the Maine lobster industry."  *Id.*

---

[13] *See* Compl. ¶ 82 fn 48 (Patrick Whittle, *Retailers pull lobster from menus after 'red list' warning*, Associated Press, September 8, 2022, available at: https://www.newscentermaine.com/article/money/business/retailers-pull-lobster-menu-after-red-list-warning/97-4c588f2f-8d33-42b5-a4a1-ac17ecb6dbcd).

[14] *See* Margaret Osborne, *Lobsters Placed on 'Red List,' Angering Maine Fishing Community*, Smithsonian, September 13, 2022, available at: https://www.smithsonianmag.com/smart-news/lobsters-placed-on-red-list-angering-maine-fishing-community-180980748; Karen McVeigh, *US lobster put on 'red list' to protect endangered North Atlantic right whales*, The Guardian, September 8, 2022, available at: https://www.theguardian.com/environment/2022/sep/08/us-lobster-put-on-red-list-to-protect-endangered-north-atlantic-right-whales; Max Sullivan, *American lobster was added to Seafood Watch's 'red list.' Maine lobstermen are fighting back*, USA Today, September 10, 2022, available at: https://www.usatoday.com/story/news/nation/2022/09/10/lobster-red-list-maine-seafood-watch/8048412001/.

These sources confirm that those who read the Aquarium's Statements understood that they referred to all members of the Maine lobster industry, including Plaintiffs. *See Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 529-30 (1st Cir. 2023) (finding that the "of and concerning" element was satisfied by evidence that third parties understood the statements to refer to plaintiff's business and ceased doing business with plaintiff as a result).

**B. The Aquarium Defamed All Businesses That Harvest or Sell Lobsters From the Gulf of Maine and Georges Bank Fisheries.**

The Aquarium's argument that the Plaintiffs cannot pursue a defamation claim as members of a defamed group, *see* Def. Mem. at 30, is unavailing. Plaintiffs are part of a group that is discrete and identifiable, and the Statements applied to every member of that group. Courts have recognized that individuals in a defamed group have standing to sue for defamation where "the matter can reasonably be understood to refer to the member, or . . . the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member." *Conformis*, 58 F.4th at 530 (citing Restatement (Second) of Torts § 564A). For example, the Restatement explains that a statement "that all members of a school board or a city council are corrupt is sufficiently definite to constitute a defamatory publication of each member thereof." Restatement (Second) of Torts § 564A cmt. c.

This same principle applies to the Statements about all Maine lobstermen. The group of Maine lobstermen is sufficiently discrete and identifiable that the Statements were reasonably understood to apply to all of them.

Indeed, the Statements targeted fishing practices that the Aquarium attributed to all Maine lobstermen, without leaving open the possibility that some Maine-caught lobsters pose no risks to right whales. For example, the Aquarium stated that "*each* fishery" using vertical lines "is putting [the right whale] at risk of extinction." Sept. 16 Press Release. Such Statements were reasonably understood to apply to every person harvesting lobsters in the Gulf of Maine and Georges Bank. This is very different from the Restatement's examples of non-actionable statements about a group, such as "all lawyers are dishonest or all ministers are liars," which on their face are gross

generalizations and not understood to be statements of fact about all lawyers and ministers. Restatement (Second) of Torts § 564A cmt. c.

Here, nothing in the Aquarium's Statements could be understood to apply to fewer than all the lobstermen fishing in the Gulf of Maine and Georges Bank, or to be a generalization. By telling consumers to avoid all Maine-caught lobster because "scientific data" showed that they are caught in a manner that causes death and serious harm to right whales, the Aquarium expressed that its criticisms apply to the fishing practices of *all* lobstermen in those fisheries.

The cases the Aquarium cites are distinguishable. In *Robinson*, for example, plaintiffs sought to pursue defamation claims based on an article that did not refer to plaintiffs or the products they sell, and could have been understood to refer to other distributors of other products. *See* 297 F. Supp. at 725-26 (cited in Def. Mem. at 30). And, in *Robinson*, there was no evidence that any reader understood the article to refer to plaintiffs or their products. *Id.*

The Aquarium also wrongly suggests that it cannot be sued for defamation because there are 5,600 lobstermen in the Maine fishery. *See* Def. Mem. at 30. The size of the defamed group matters only if the defamatory statement is alleged to refer to *some but not all* members of the group. For example, in *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977), one unidentified police officer on a force of 21 officers was alleged to have engaged in wrongful conduct. This attenuated ratio was insufficient to support liability. The court explained that it had "discovered no case where a group libel, justifying suit by all members, was held to arise from a slur against one unidentified member," and based dismissal on "the ratio of the defamed to the total." *Id.* at 1165. *See also Robinson,* 297 F. Supp. at 726 (noting that defamation claim would be permitted by a member of a group where "the group or class is so small that the statements may reasonably be understood to refer to *each* member") (emphasis added).

Here, because the Statements defamed *all* members of the group, any or all of the group's members may sue the Aquarium for defamation. *See Kentucky Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978) ("To defame a class, the statement must be applicable

to every member of the class.").  For example, in *Fawcett Publications, Inc. v. Morris*, 1962 OK 183, 377 P.2d 42, which *Arcand* cites with approval, defendant stated that all members of a college football team used performance enhancing drugs.  The court held that a single member of the team had a viable defamation claim: "'The general rule is that if defamatory language is used towards an entire group, including every one of them, it may be said to refer to each member of the group so that each may sue.'" *Id.* at ¶ 47.

The Aquarium's Statements here applied to all lobsters sourced from the "Gulf of Maine/Georges Bank" lobster fisheries, and told consumers that "*all* of the fisheries using this gear are considered a risk." Sept. 5 Press Release.  As a result, the false Statements implicate each Maine lobsterman.

As businesses selling Maine lobsters, Plaintiffs BML and Atwood are also reasonably understood as targets of the Aquarium's Statements.  In *Conformis*, the plaintiff, a leading manufacturer and seller of customized knee replacements, sued an insurance company that issued a policy statement criticizing "all customized" knee replacements.  Although plaintiff and its product were not criticized by name, the court held that the "of and concerning" requirement was satisfied. *See* 58 F.4th at 529–30.  *Conformis* held that a reasonable reader could understand the statements to reference plaintiff.  *Id.*  Indeed, as the court noted, a separate subsection of defendant's publication (unrelated to the statements at issue) discussed plaintiff's knee implant.  *Id.*

As in *Conformis*, BML and Atwood sell a unique product—Maine-caught lobsters. Negative statements about lobsters harvested from the Maine fishery could reasonably be understood to impugn the sellers of those lobsters.  And similar to *Conformis*, the Aquarium devoted sections of its Report specifically to the Gulf of Maine lobster stock.  *See, e.g.*, Report at 40–44.  Therefore, the Statements are sufficiently directed at the Plaintiffs to constitute defamation of each one of them.

### C.  The Aquarium Expressed and Implied Verifiably False Facts About the Maine

**Lobster Industry, and Did Not Merely Express Opinions or Hyperbole.**

At the core of the Aquarium's Report, press releases, and interviews is an unmistakable message to consumers and businesses: The Maine lobster fishery is responsible for the harm, death, and near-extinction of right whales. The Aquarium presented this message as fact supported by a "rigorous, transparent, science-based process." Compl. ¶ 8.

In something of an about-face, the Aquarium's brief tries to walk back these Statements, claiming that it was merely expressing an "opinion based on tentative scientific data" and, in one instance, engaging in "rhetorical hyperbole." Def. Mem. at 33. The Aquarium's post-hoc characterizations neither change how readers contemporaneously understood these Statements nor ameliorate the harm that the Statements have caused.

Maine courts ask whether "it is clear from the surrounding circumstances that the maker of the statement did not intend to state an objective fact but intended rather to make a personal observation on the facts." *Caron v. Bangor Publishing Co.*, 470 A.2d 782, 784 (Me. 1984). The test is "whether the statement is properly understood as purely speculation or, alternatively, implies that the speaker or writer has concrete facts that confirm or underpin the truth of the speculation." *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 250 (1st Cir. 2000), *citing Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir.1997). A statement "couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997).

Here, the surrounding circumstances confirm that the Aquarium intended to state objective facts about Maine lobster-fishing practices, not opinion or hyperbole. The Aquarium describes itself as a "global leader in the sustainable seafood movement" and "the leading source of science-based information for sustainable seafood around the world."[15] This conveyed that the Aquarium is a reliable source of factual scientific conclusions, not a purveyor of opinion or hyperbole. The

---

[15] *See* Compl. ¶ 34 (citing Seafood Watch, https://www.seafoodwatch.org/ and *Stories*, Seafood Watch, https://www.seafoodwatch.org/stories).

audience naturally understood as factual the Statements that Maine lobster gear puts right whales "at risk of extinction," and that Maine lobster is "caught or farmed in ways that harm other marine life or the environment." These Statements amount to an accusation that Maine lobster fishermen are responsible for killing right whales. *See Cross v. Guy Gannett Publishing Co.*, 151 Me. 491, 494-95, 121 A.2d 355, 357 (1956) ("Insinuations may be as defamatory as direct assertion, and sometimes even more mischievous.").

The Aquarium's "opinion, theory and hyperbole" arguments are not saved by the existence of isolated phrases in the Report. *See* Def. Mem. at 32. *First*, this record establishes that *actual* readers of the Report treated it as factual and acted upon it, and refused to market, buy or sell Maine lobster.[16] The isolated equivocating phrases identified by the Aquarium did not dilute the gist and sting of the Statements in the minds of those readers. *See Sinclair v. Gannett*, 148 Me. 229, 236, 91 A.2d 551, 554 (1952) (noting that information is "read in the haste of daily living" and that "[t]he reader can hardly be expected with studious care to search out and to recognize delicate shades in meaning and application of the printed word and picture").

*Second*, the law is clear that self-serving insertions of qualifying language do not insulate the author from liability for defamation. *See, e.g.*, *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980) ("It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.'"); *Weller v.*

---

[16] *See, e.g.*, **Opp. Ex. 3** (Dino Grandoni, *Want to save the whales? Reconsider the lobster, some say*, THE WASHINGTON POST, December 2, 2022, https://www.washingtonpost.com/climate-environment/2022/12/03/maine-lobster-whales-right/ (comments include: "The Gulf of Maine is warming at a furious pace. Maine Lobsters will be gone from [M]aine waters. Stop killing whales" and "First, the idiots raise the temperature dooming Maine lobster fishing. Then, the idiots want to kill off the whales in the meantime rather than give up ropes"); **Opp. Ex. 4** (Comments posted to December 2022 Reddit article, *How Maine lobster fishermen keep the lobster population sustainable*: (comments include: "What about all the right whales they kill?" and "Whale strangling lobster fishing. Boycott lobster!")); **Opp. Ex. 5** (Comment posted to October 2022 Reddit article, *Calls to defund the Monterey Bay Aquarium from politicians from Maine after Seafood Watch puts Maine lobsters on the 'avoid these foods' list!* ("I didn't know about the [S]eafood [W]atch, or about how lobster fishing in Maine kills right whales… Until now. . . . [N]ow I'll be specifically avoiding Maine lobster and using [S]eafood [W]atch whenever I buy seafood.")).

*American Broadcasting Companies, Inc.*, 232 Cal. App. 3d 991, 1004 (Ct. App. 1991) ("[W]e reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as "apparently" or "some sources say" or even putting it in the form of a question, necessarily defuses the impression that the speaker is communicating an actual fact."). A statement alleged to be defamatory is construed "in the light of what might reasonably have been understood therefrom by the persons who heard it." *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 (1st Cir.2000) (quoting *Marston v. Newavom*, 629 A.2d 587, 592 (Me. 1993)). Courts "consider the context in which the challenged statement is made, viewing it within the communication as a whole." *Levesque v. Doocy*, 560 F.3d 82, 88 (1st Cir. 2009).

*Third*, in context, the Aquarium's Statements condemning Maine lobster fishing based on supposed "scientific data" brushed aside the Report's isolated and sporadic acknowledgments that the data actually were uncertain. The Aquarium now argues that it "does not assert there exists conclusive evidence" for its Statements, Def. Mem. at 32. But no similar disclaimer exists in the Aquarium's publications. In fact, despite the uncertainties and the lack of supporting data, the Aquarium repeatedly insisted that it must attribute blame to the Maine lobster fishery. *See, e.g.*, Sept. 5 Press Release ("Until there is more evidence, all of the fisheries using this gear are considered a risk."). Far from shielding the Aquarium from accountability, the massive gap between what the Aquarium knew and its Statements that "each fishery" using vertical lines "is putting [the right whale] at risk of extinction," is convincing evidence of liability. *See* Sept. 16 Press Release. Indeed, the Aquarium's suggestion that the putative extinction of right whales will be caused by the Maine fishery—notwithstanding unrebutted evidence to the contrary from the authoritative scientific database on serious injury and mortality to right whales, *see* McCarron Decl. at ¶¶ 6–15—was a reckless, if not deliberate, falsehood for which the law imposes liability.

Whether the Maine lobster fishery's practices and equipment kill right whales is a matter of fact, not opinion—and the facts show that they do not. The Aquarium argues that because the Statements implicate science, they are somehow rendered unactionable. But this is not the law.

31

Courts have long adjudicated whether business or governmental actions endanger a protected species by looking at the available scientific data. *See, e.g., Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, __ F.4th __, 2023 U.S. App. LEXIS 14987, *2-3 (D.C. Cir. 2023) ("The [Endangered Species Act] and the implementing regulations call for an empirical judgment about what is 'likely.'"). In *Maine Lobstermen's Association*, the D.C. Circuit Court recently found that NMFS committed egregious errors in its allocation of responsibility for right whale deaths, "distort[ing] scientific judgment by indulging in worst-case scenarios and pessimistic assumptions to benefit a favored side." *Id.* at *3, *9–10. The court found NMFS had improperly resolved "uncertainties in the data" with a thumb-on-the scale "precautionary principle" in favor of the right whale. *Id* at *27. For example, faced with data about unknown and unseen whale deaths, NMFS allocated half of those deaths to U.S. fisheries, in disregard of the available scientific data. *Id.* at *36. By doing so, NMFS failed to "form a scientific judgment" about the lobster fishery's effect on right whales. *Id.* at *30. Here, the Aquarium engaged in a similar misrepresentation of scientific data to the public that the Court should subject to scrutiny under the laws of defamation.

The cases the Aquarium cites to argue that its Statements are "based on, and restate, tentative scientific conclusions," Def. Mem. at 31, are distinguishable. The protected statements in those cases appeared in peer-reviewed scientific journals. *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 243 (3d Cir. 2023); *ONY, Inc. v. Cornerstone Therapeutics, Inc.* 720 F.3d 490, 494 (2d Cir. 2013); *Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 176 (D. Mass. 2015) (cited in Def. Mem. at 31). The *ONY* court emphasized that the statements were "conclusions reached by experiments" 720 F.3d at 497. "Importantly, those conclusions are presented in publications directed to the relevant scientific community . . . [and] are then available to other scientists who may respond by attempting to replicate the described experiments." *Id.*

The Aquarium is not a scientific authority. It conducted no experiments. It directed its Statements to the public with the express goal of harming Plaintiffs economically, not for analysis by the scientific community. In addition, both *ONY* and *Pacira* concerned the relative effectiveness

32

of two medical products and drew on principles of advertising law not applicable here to determine the statements were nonactionable.  *Id.* at 494, 496; 63 F.4th at 245–46.

The Aquarium, in contrast, asserted as fact that Maine lobster gear harms or kills right whales.  It did not "restate" scientific conclusions because there is no evidence of any right whale entanglement in Maine lobster gear.  Rather, the Aquarium's conclusions were based on a *lack* of scientific data. *See* Report at 50 ("Until there is more specific information available regarding which fisheries are responsible for unattributed entanglements, Seafood Watch considers that all relevant fisheries that may overlap with NARW pose risks.").

In another important decision on this issue, the First Circuit in *Conformis* held that a statement could be defamatory even where couched as a rating within a self-styled "policy statement."  The defendant there sought to protect itself from libel by characterizing its statement as mere opinion.  58 F.4th at 532.  The First Circuit rejected that argument, concluding that the policy statement could be understood to convey verifiable facts because "whether [plaintiff's product] is safe or medically effective are questions that suggest an appraisal of that treatment against objective professional or scientific standards." *Id.*  The Aquarium's authoritative Statements here are actionable because they were understood to convey verifiable facts.

The Aquarium erroneously asserts that the Complaint characterizes seven of the Statements at issue as "conjecture."  In fact, the Complaint uses this term only to describe a statement that the Complaint does not allege to be defamatory:  The Aquarium's assertion that there are entanglements with gear from unknown origins, "of which the lobster fishery may be a part."  Compl. ¶ 68.  While this statement did not constitute defamation, it reveals that the Aquarium knew its Statements about Maine-caught lobsters were not based on facts or science.

Finally, even if some of the Aquarium's Statements were opinion, that would not shield the Aquarium from liability.  There is no "wholesale defamation exemption for anything that might be labeled 'opinion," and "[e]xpressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).  As shown above, the Aquarium's

33

Statements at the very least implied that there were objective facts supporting its conclusion that Maine-caught lobsters pose risks of death and serious harm to right whales.

### D. Plaintiffs Have Adequately Pled State of Mind.

Courts typically refrain from granting Rule 12(b)(6) motions for failure to plead sufficient facts to establish state of mind. *See Conformis*, 58 4th at 528 ("This inquiry does not demand a plentitude of factual content."); *Green v. Cosby*, 138 F. Supp. 3d 114, 139 (D. Mass. 2015) ("[F]acts pertaining to state of mind in defamation actions need not be alleged with extreme detail, due to the difficulty of definitively ascertaining them at this stage of litigation."). Generally, a plaintiff is unlikely to have sufficient information regarding the defendant's thoughts and motivations prior to discovery. *See Conformis*, 58 4th at 528. *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Here, different state of mind standards exist for different Plaintiffs. As the Aquarium concedes, BML, Atwood, and Bug Catcher are private figures, *see* Def. Mem. at 36, and need only prove that the Aquarium was negligent. *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 10, 222 A.3d 1063. Having taken public positions on issues relating to the lobster fisheries, MLA and MCFA must prove the higher standard of actual malice. While a more difficult standard to meet than ordinary negligence, courts have found that actual malice may be inferred where a defendant is confronted with contradictory facts but ignores them and publishes the statements anyway. *See Sindi v. El-Moslimany*, 896 F.3d 1, 16 (1st Cir. 2018) (affirming finding of actual malice where defendant "deliberately ignored facts that called her public statements into question.").

Plaintiffs have satisfied both scienter standards. Before publication, Plaintiff MLA confronted the Aquarium with conclusive evidence contradicting its planned assessment. *See* Complaint ¶¶ 60–67; McCarron Decl. ¶¶ 6–15. The Aquarium unreasonably disregarded this evidence and published the Statements. *Id.* ¶¶ 67-68. These allegations are sufficient to support findings of both negligence and actual malice. *See Sindi,* 896 F.3d. at 14.

Similarly, in a recent Delaware case, *US Dominion, Inc. v. Fox News Network, LLC*, the

plaintiff's compendium of documents evidencing that the defendant had been presented with verifiable facts contradicting its storyline was enough at the pleading stage to support that the defendant acted with knowledge of falsity or reckless disregard for the truth. *See US Dominion*, No. CV N21C-03-257 EMD, 2021 WL 5984265, at *28 (Del. Super. Ct. Dec. 16, 2021), *cert. denied*, No. CV N21C-03-257 EMD, 2022 WL 100820 (Del. Super. Ct. Jan. 10, 2022), and *appeal refused*, 270 A.3d 273 (Del. 2022). The Delaware Court later held there was sufficient evidence of actual malice to weather summary judgment. *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 EMD, 2023 WL 2730567, at *41 (Del. Super. Ct. Mar. 31, 2023).

### E. An Injunction Against Continued Publication of Defamatory Statements Is Constitutionally Valid and Is Not an Impermissible Prior Restraint.

Finally, there is no merit to the Aquarium's argument that the requested injunction would be an impermissible prior restraint on future speech. *See* Def. Mem. at 38. Plaintiffs are not asking the Court to enjoin the Aquarium from any future speech. Rather, Plaintiffs seek an injunction as additional relief after a finding of liability, requiring the Aquarium to "remove and retract any and all defamatory statements from its website and other publications." Compl. ¶¶ 13, 110.

The requested injunction is consistent with the First Amendment, which does not protect speech that is defamatory. *See Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 245–246 ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation . . . ."). For example, in *Sindi*, the First Circuit vacated an order enjoining "republication" of certain statements, but expressed "no view of the legality of an injunction ordering 'the removal or deletion of speech that has been adjudicated defamatory,' such as a decree requiring the erasure of a statement from a website after an adjudication that the statement was 'unprotected in the context in which it was made.'" *Sindi*, 896 F.3d at 35 (citations omitted). As *Sindi* noted, "an injunction against speech sometimes may pass constitutional testing if it follows an adjudication that the expression is unprotected, and the injunction itself is narrowly tailored to avoid censoring protected speech." *Id.* at 32.

### F. If Necessary, Plaintiffs Should Be Given Leave to Amend the Complaint.

To the extent that the Court finds that the Complaint fails to plead any element of a defamation claim, Plaintiffs request leave to amend in order to cure the deficiency. *See Amyndas Pharm., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 37 (1st Cir. 2022) ("Generally, valid reasons [for leave to amend] include a motion to dismiss or a ruling from the court pointing out flaws in the original pleading or the discovery of new information.").

**CONCLUSION**

For the foregoing reasons, the Aquarium's Motion should be denied.


Dated: Portland, Maine
      July 24, 2023

ROACH RUPRECHT SANCHEZ & BISCHOFF P.C.

By: /s/ Clifford Ruprecht
Clifford Ruprecht
527 Ocean Avenue, Suite 2
Portland, ME  04103
(207) 747-4870
cruprecht@rrsblaw.com

*Attorneys for Plaintiffs Bean Maine Lobster, Inc.,
Maine Lobstermen's Association, Inc., Maine Coast
Fishermen's Association, Inc., Maine Lobster and
Processing, LLC d/b/a/ Atwood Lobster, LLC, and
Bug Catcher, Inc.*


OF COUNSEL:

VENABLE LLP
Kevin J. Lipson
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4415
kjlipson@venable.com

Edward P. Boyle (motion for *pro hac vice* admission forthcoming)
Dov S. Levavi (motion for *pro hac vice* admission forthcoming)
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 808-5675
epboyle@venable.com
dslevavi@venable.com