# United States Court of Appeals
## For the First Circuit

Nos. 25-1206, 25-1772

BEAN MAINE LOBSTER, INC; MAINE LOBSTERMEN'S ASSOCIATION; MAINE COAST FISHERMEN'S ASSOCIATION, INC.; MAINE LOBSTER AND PROCESSING, LLC, d/b/a Atwood Lobster, LLC; BUG CATCHER, INC.,

Plaintiffs, Appellees,

v.

MONTEREY BAY AQUARIUM FOUNDATION,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Gelpí, Rikelman, and Aframe,
Circuit Judges.

Amy Mason Saharia, with whom Russell B. Pierce, Jr., Norman, Hanson & DeTroy, LLC, Lisa S. Blatt, Joseph M. Terry, Nicholas G. Gamse, Claire R. Cahill, Edward L. Pickup, Harold W. Hild, and Williams & Connolly LLP were on brief, for appellant.

Megan Barbero, with whom Clifford Ruprecht, Ruprecht & Bischoff LLP, Kevin J. Lipson, Elizabeth M. Wilson, Edward P. Boyle, Stephanie P. Diu, Kyle H. Keraga, and Venable LLP were on brief, for appellees.

October 9, 2026

**RIKELMAN**, **Circuit Judge**. This appeal concerns the so-called "group defamation rule." Under that rule, a defamatory statement about a large group is not actionable unless the statement or its context indicates that it is targeted at specific members of the group. Here, multiple companies and organizations involved in the Maine lobster industry sued the Monterey Bay Aquarium Foundation ("the Aquarium") for defamation under Maine law. The plaintiffs challenged the Aquarium's statements recommending that consumers avoid eating American lobster because lobster fishing poses a risk to the endangered North Atlantic right whale, even though those statements did not single them out in particular. The Aquarium moved to dismiss the case, arguing that the group defamation rule barred the plaintiffs' claims. The district court denied its request, concluding that the Aquarium's statements applied equally to each member of the Maine lobster industry. We disagree with the district court's application of the group defamation rule and thus reverse.

## I. BACKGROUND

### A. Relevant Facts[1]

The Maine lobster industry "employs more than 5,600 lobstermen,"[2] and in 2021 alone the fishery "hauled in more than

---

[1] We take the facts from the plaintiffs' complaint.

[2] Like the district court, we adopt the parties' use of "lobstermen" to refer to all people holding commercial licenses to

80% of the country's lobster landings." At the center of the Maine lobster industry is the Gulf of Maine, which shares a lobster stock with the adjoining Georges Bank region of the Northwest Atlantic Ocean. That is, the Maine lobster industry "targets" lobster stock in that region. Lobster fishing in the coastal waters of Maine "is subject to strict regulations that ensure resource and environmental sustainability."

The five plaintiffs in this case play important roles in the Maine lobster industry. They are (1) Bean Maine Lobster, Inc., a company that "markets and sells high-quality mid-coast Maine-caught lobster and lobster foods"; (2) the Maine Lobstermen's Association, Inc., a nonprofit "that represents roughly 1,200 of Maine's 5,600 lobstermen"; (3) the Maine Coast Fishermen's Association, Inc., a nonprofit "that works to enhance the sustainability of Maine's fisheries" and "advocat[es] for the needs of community-based fishermen"; (4) Maine Lobster and Processing, LLC, "a third-generation Maine lobster company and . . . one of the leading lobster producers in the United States"; and (5) Bug Catcher, Inc., "a lobster fishing company" in Maine run by "a sixth-generation lobsterman."

---

harvest lobster. Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found., No. 23-cv-129, 2025 WL 416436, at *3 n.1 (D. Me. Feb. 6, 2025).

The Aquarium is a nonprofit conservation and education organization based in California. It operates a program called Seafood Watch, which assigns ratings to different species of seafood, including lobster, "based on environmental impact and sustainability." A "green" rating signifies that the seafood is the "best choice." A "yellow" rating indicates that the seafood is a "good alternative." A "red" rating, by contrast, means that consumers should "avoid" the seafood because it "comes from sources that don't align with [Seafood Watch's] guiding principles." In assigning ratings, the Aquarium considers the effects of seafood consumption and fishing practices on endangered species. Through its Seafood Watch program, the Aquarium aims to influence the decisions of seafood consumers, businesses, and regulators.

For many years, the Aquarium has raised concerns about the impact of fishing on the North Atlantic right whale, which is found primarily in the waters of the North Atlantic Ocean. The North Atlantic right whale is listed as an endangered species under the Endangered Species Act and is protected under the Marine Mammal Protection Act. According to the Aquarium, one threat to the North Atlantic right whale is the risk of entanglement in fishing gear, including the buoy lines lobstermen use to mark the placement of their lobster traps.

"[A] collaboration of fisheries, agencies, scientists, lobstermen and environmental groups" developed the Atlantic Large

Whale Take Reduction Plan ("the Take Reduction Plan") in 1997. That Plan required implementation of "innovative fishing practices and gear deployment strategies designed to protect right whales." In the years since, those efforts have been "continuously updated and improved." Adjustments to the Take Reduction Plan have focused on reducing the risk of whale entanglement in commercial fishing gear, including lobster trap buoy lines. From 1997 to 2011, the North Atlantic right whale population increased from 295 whales to a high of 481.

In 2014, the Aquarium's Seafood Watch program assigned a yellow rating to Maine lobster, recommending that consumers and businesses "[b]uy, but be aware there are concerns with how [lobsters are] caught, farmed or managed." A few years later, in 2017, the National Marine Fisheries Service detected an "unusual rate of mortalities" that reduced the North Atlantic right whale population to only about 350 whales.

In the last decade, the Maine lobster industry has implemented "even more changes to its fishing practices to protect right whales." For example, modifications to the Take Reduction Plan in 2021 "decreased the amount of rope in the water, created more exacting requirements for weak links, weak rope and break-aways to weaken vertical fishing lines, and closed nearly 1,000 square miles of fishing grounds for an entire season each year."

Nevertheless, in September 2022, the Aquarium issued a press release ("the Press Release"), announcing that it had "assign[ed] red ratings to certain Canadian and U.S. fisheries" in light of the "dire risk to the endangered North Atlantic right whale" posed by the fisheries. The Press Release stated that the red ratings were based on "significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species."

The day after announcing that it was assigning these new red ratings, the Aquarium's Seafood Watch program published the 73-page report at issue in this case ("the Report"), detailing its recommendations regarding the fishing and consumption of American lobster. In the Report, the Aquarium downgraded the rating of American lobster from yellow to red. It recommended that consumers "[a]void American lobster caught by trap from Georges Bank and the Gulf of Maine stocks due to risks to the critically endangered North Atlantic right whale and insufficient measures for reducing these risks." It emphasized that, "[d]ue to a lack of information, it is often not possible to assign entanglements to a specific fishery." Thus, the Aquarium concluded that "[u]ntil there is more specific information available regarding which fisheries are responsible for the unattributed entanglements[,] . . . all

relevant fisheries that may overlap with [the North Atlantic right whale] pose risks." Further, the Aquarium commented on the ineffectiveness of management efforts and the Take Reduction Plan, asserting that they "have not been successful at reducing serious injury and mortality to the North Atlantic right whale."

In the Report, the Aquarium did not identify by name any of the plaintiffs or any other individual, association, or company involved in the Maine lobster industry. Still, the plaintiffs allege that they lost substantial business following the publication of the Report. For instance, the owner of Bug Catcher, Inc. estimates that he has lost about 20% of his business since the Aquarium issued its "red" rating. And in one instance, a major customer of Maine Lobster and Processing, LLC specifically cited the "red" rating when it announced that it would no longer be purchasing lobster from the Gulf of Maine.

**B. Procedural History**

The plaintiffs eventually sued the Aquarium for defamation based on its statements about the Maine lobster industry, including statements made in the Press Release and the Report. They filed their lawsuit in March 2023 in the U.S. District Court for the District of Maine.

In their complaint, the plaintiffs allege that the Aquarium "knowingly and intentionally published false and injurious statements disparaging [their] products and business,

including, among other things, that commercial lobster fishing practices in the Gulf of Maine cause death and serious injury to North Atlantic right whales." The plaintiffs challenge the following statements by the Aquarium ("the Statements")[3]:

> (a) "At this time, each fishery using this gear is putting this protected species [i.e., the right whale] at risk of extinction."
>
> (b) "No one wants to know their appetite for seafood is driving a species to extinction."
>
> (c) "Seafood rated Avoid comes from sources that don't align with our guiding principles. The seafood is caught or farmed in ways that [have a high risk of causing] harm [to wildlife] or the environment. There's a critical conservation concern or many issues need substantial improvement."
>
> (d) "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale."
>
> (e) "Based on the available information and the significant risks to [the North Atlantic right whale], the American lobster fishery cannot be considered sustainable."
>
> (f) "The updated assessments highlight significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species."
>
> (g) "Seafood Watch reviewed all available scientific data, including the latest stock assessments as well as state, federal, and

[3] We indicate with highlighting where plaintiffs only challenge a portion of a sentence as defamatory.

> provincial management measures." And "[t]he 14 assessments released today are part of Seafood Watch's rigorous, transparent, science-based process to evaluate the current environmental performance of a fishery."[4]
>
> (h) "According to Seafood Watch standards, when fisheries pose a high risk of harm to marine life or the environment and appropriate management measures are not in place, they are assigned a red rating."
>
> (i) "Avoid/Red: Take a pass on [seafood receiving this rating] for now; they're caught or farmed in ways that harm other marine life or the environment."

Some of these statements appear in the Press Release. Others appear in the Report. Still others do not appear in either document.[5]

Two months after the plaintiffs sued, the Aquarium filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. In its motion, the Aquarium argued that the Statements were (1) about the Gulf of Maine/Georges Bank area lobster industry at large, not "of and concerning" the plaintiffs specifically, and (2) non-actionable scientific opinion, rather than defamatory assertions of fact. In

---

[4] These statements do not appear together in the Press Release.

[5] We assume that the Aquarium made these statements elsewhere because we are bound to accept as true all well-pleaded factual allegations in the plaintiffs' complaint in analyzing a denial of a motion to dismiss. See Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009).

the alternative, the Aquarium sought dismissal under Maine's anti-SLAPP statute,[6] arguing that the Statements constituted protected petitioning activity.[7]

The district court denied the Aquarium's motion to dismiss. See Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found., No. 23-cv-129, 2025 WL 416436, at *59 (D. Me. Feb. 6, 2025). The court first concluded that the plaintiffs had "carried their burden of defeating [the Aquarium's] motion" under Maine's anti-SLAPP statute. Id. at *43. It then determined that the plaintiffs had stated a claim for defamation by adequately alleging that the Aquarium's statements were (1) "reasonably understood as

[6] SLAPP stands for Strategic Lawsuit Against Public Participation. Maine's anti-SLAPP statute at the time, 14 M.R.S. § 556 (repealed 2025), was "designed to guard against meritless lawsuits brought with the intention of chilling or deterring the free exercise of the defendant's First Amendment right to petition the government." Schelling v. Lindell, 942 A.2d 1226, 1229 (Me. 2008). Under the statute, defendants could file a "special motion to dismiss" in order to "minimize the litigation costs associated with the defense of such meritless suits." 14 M.R.S. § 556. The Maine legislature has since replaced that statute with a more comprehensive anti-SLAPP statute. See 2023 Me. Laws 1404.

[7] The Aquarium also contended that the plaintiffs had not adequately alleged other elements of a defamation claim. Separately, the Aquarium sought dismissal for lack of personal jurisdiction or, in the alternative, transfer of venue. The district court found it had personal jurisdiction and denied the motion to transfer; it further ruled that the plaintiffs had sufficiently alleged that the Aquarium acted with actual malice when publishing the challenged statements. The Aquarium does not appeal these rulings.

'of and concerning' them" and (2) actionable assertions of fact. Id. at *49; see id. at *53.

In its ruling, the district court acknowledged the group defamation rule, which typically precludes plaintiffs from establishing that a defamatory statement was "of and concerning" them when the statement in question was directed at a group as a whole. See id. at *45. But the court concluded that the plaintiffs' claims fell under an exception to the rule, set out in the Second Restatement of Torts, which applies when "the circumstances of publication reasonably give rise to the conclusion that there is particular reference to [a] member [of the group]." Id. at *45-47 (quoting Restatement (Second) of Torts § 564A(b) (A.L.I. 1977)).

Specifically, the district court determined that the "letter and spirit of the group defamation rule" did not apply for four reasons: First, "the industry-wide nature of the Statements necessarily implicated each and every member of the Plaintiff group." Id. at *47-48. Second, the Statements were not "the type of hyperbolic statements that undergird the group defamation rule" but instead "purported to be based upon scientific data." Id. at *48. Third, the Statements "included a call to action" directing consumers to avoid purchasing American lobster. Id. Fourth, and finally, certain of the plaintiffs' customers had specifically

referenced the Report as influencing their decision to stop purchasing the plaintiffs' lobster. Id.

The Aquarium timely appealed the denial of its anti-SLAPP motion under the collateral order doctrine. Separately, it moved for certification of an interlocutory appeal under 28 U.S.C. § 1292(b) to enable review of the district court's order denying dismissal of the plaintiffs' defamation claim, including its application of the group defamation rule. The district court granted the motion for interlocutory appeal, and we in turn granted the Aquarium's petition and consolidated the two appeals.

## II. STANDARD OF REVIEW

We review de novo a district court's denial of a motion to dismiss under Rule 12(b)(6). See First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 51 (1st Cir. 2007). In doing so, "[w]e accept as true the complaint's well-pleaded factual allegations, and draw all reasonable inferences in favor of the" plaintiffs as the non-moving parties. McKee v. Cosby, 874 F.3d 54, 59 (1st Cir. 2017).

## III. DISCUSSION

The Aquarium contests multiple aspects of the district court's ruling denying its motion to dismiss. Because we agree with the Aquarium that the group defamation rule bars the plaintiffs' claims, we do not reach its other arguments.

For starters, "[a]s a federal court sitting in diversity jurisdiction, we look to [Maine] law for the substantive rules of decision governing" the plaintiffs' state-law defamation claim.[8] Blakesley v. Marcus, 158 F.4th 90, 95 (1st Cir. 2025) (citation modified) (quoting Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 47 (1st Cir. 2023)). As the district court observed, however, there is limited precedent from Maine courts on the scope of the exceptions to the group defamation rule. Bean Me. Lobster, Inc., 2025 WL 416436, at *46. Thus, we must "endeavor to predict how [Maine's] highest court would rule on" the legal questions before us. Blakesley, 158 F.4th at 95 (citation modified) (quoting Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024)). And as "it is quintessentially the province of state courts to extend state law," we should "exercise considerable caution" before adopting a novel application of Maine law. Id. at 100 (citation modified) (first quoting Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996); and then quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 192 (1st Cir. 1996)).

With that in mind, we trace the history and rationale of the group defamation rule and the contours of its exceptions. We then apply those principles to the facts set out in the complaint and conclude that the Supreme Judicial Court of Maine ("the Law

[8] The district court had jurisdiction to consider the plaintiffs' state-law claims under 28 U.S.C. § 1332(a).

Court") would hold that the group defamation rule bars the plaintiffs' claims.

**A. The Group Defamation Rule and Its Exceptions**

To maintain an action for defamation under Maine law, a plaintiff must establish that the alleged defamatory statement was "of and concerning" them. See Hudson v. Guy Gannett Broad. Co., 521 A.2d 714, 716 (Me. 1987). When a statement defames a large group of which the plaintiff is a member, courts have generally concluded that the plaintiff cannot satisfy the "of and concerning" element by virtue of the common-law principle known as the group defamation rule. Under this rule, "[d]efamation of a large group gives rise to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself." Arcand v. Evening Call Publ'g Co., 567 F.2d 1163, 1164 (1st Cir. 1977) (quoting Joseph Tanenhaus, Group Libel, 35 Cornell L.Q. 261, 263 (1950)).

The group defamation rule predates our Constitution. See R v. Alme & Nott (1699) 91 Eng. Rep. 790; 3 Salk. 224 (KB) (per curiam). And since the 1800s, courts have justified the rule, in part, based on the concern that affording every member of a large group a cause of action would threaten to stifle "free discussion" beneath an avalanche of "embittered and boundless

litigation."[9] Ryckman v. Delavan, 25 Wend. 186, 199 (N.Y. 1840). As the United States Court of Appeals for the District of Columbia described in an early case, "courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual." Serv. Parking Corp. v. Wash. Times Co., 92 F.2d 502, 505-06 (D.C. Cir. 1937); see also Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 531 (2d ed. 2011) (explaining the rationales for the group defamation rule).

The modern understanding of the group defamation rule is set out in the Second Restatement of Torts. Because the Law Court has adopted the Second Restatement's approach to other aspects of defamation law, we predict (and the plaintiffs agree) that the Law Court would adopt its approach to the group defamation rule as well. See Hudson, 521 A.2d at 717 (adopting the "'of and concerning' requirement" set out in the Second Restatement). Specifically, § 564A of the Second Restatement states:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
>
> (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or

[9] This public policy rationale is distinct from the constitutional question of whether such "free discussion" is protected under the First Amendment.

> (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

Restatement (Second) of Torts § 564A (emphasis added).

The group defamation rule, as articulated in the Second Restatement, thus consists of a general principle -- "no action lies for the publication of defamatory words concerning a large group or class of persons" -- with two exceptions. Id. cmt. a. The first is the "small-group exception," which typically applies to groups of "25 or fewer" people. Id. cmt. b. Because the Statements here described the activities of some 5,600 lobstermen in Maine alone, the district court found that the small-group exception did not apply, and the plaintiffs have not argued otherwise on appeal. Bean Me. Lobster, Inc., 2025 WL 416436, at *47. Still, we discuss the principles underlying the small-group exception because they are important to our overall analysis.

The theory behind the small-group exception is straightforward. As the Second Restatement explains it, when a "sufficiently small" group is defamed, "the words may reasonably be understood to have personal reference and application to any member of" the group. Restatement (Second) of Torts § 564A cmt. b.

The other exception is the "particular-reference exception."[10] The linchpin of this exception is the requirement of a particular reference to the plaintiff -- "particular" in the sense of "distinctive among other examples or cases of the same general category." Particular, Merriam-Webster's Collegiate Dictionary (10th ed. 1993). For many years, courts have concluded that a defamatory statement that applies equally to every member of a large group is not particular to the plaintiff. See Serv. Parking Corp., 92 F.2d at 506 (claim failed under group defamation rule for absence of evidence that statement was "solely or especially" about plaintiff); Comes v. Cruce, 107 S.W. 185, 186 (Ark. 1908) (statement not actionable for lack of evidence that "the business of any individual, as distinct from a class, was specified as being illegal" (emphasis added)).

Two more recent cases illustrate the particular-reference exception in action. In JB & Associates, Inc. v. Nebraska Cancer Coalition, 932 N.W.2d 71 (Neb. 2019), a group of tanning salons (representing nearly three-quarters of all such salons in the Omaha and Lincoln markets) sued for defamation after a Nebraska anti-cancer advocacy group launched a website to warn about the dangers of tanning beds. See id. at 75-77. The allegedly

[10] The district court referred to this as the "circumstances-of-publication" exception. Bean Me. Lobster, Inc., 2025 WL 416436, at *45. We use the "particular-reference" formulation to emphasize what we view as the central inquiry required by the exception.

defamatory statements primarily consisted of assertions about the tanning industry and the dangers of tanning, including statements that "[t]anning facilities do not require a license to operate in Nebraska" and that "[j]ust one indoor tanning session increases your risk of melanoma by 20%." Id. To support their claims, the tanning salons offered evidence that customers who had visited the advocacy group's website had asked salon staff about the safety of indoor tanning. Id. at 77.

Although the challenged statements in JB & Associates categorically described the operations of the entire Nebraska tanning industry -- and thus necessarily described the plaintiffs' facilities -- the Nebraska Supreme Court concluded that the particular-reference exception was not met. See id. at 79-80 (applying Second Restatement). The court noted that nothing in the statements or context "implied that the statements were targeted at" the plaintiff salons rather than indoor tanning more broadly, and it discounted the customer interactions because no customers had indicated that "they believed the statements were about [plaintiffs' salons] specifically." Id. at 79 (emphasis added).

By contrast, in Conformis, Inc. v. Aetna, Inc., 58 F.4th 517 (1st Cir. 2023), we applied the Second Restatement under Massachusetts law and concluded that the particular-reference exception was triggered such that the plaintiff's product

disparagement claim could proceed. See id. at 528-29, 530 (explaining that a disparagement claim has many of the same elements as a defamation claim and applying the "of and concerning" requirement from the defamation context). In that case, the manufacturer of a total-knee-replacement (TKR) device sued Aetna for product disparagement based on an updated policy document Aetna had published. See id. at 525-28. The document set out Aetna's decision to deny coverage for all customized TKR devices on the basis that they were "experimental and investigational because [their] effectiveness has not been established." Id. at 526. We noted that although the statement did not mention the plaintiff manufacturer by name, the context left "little doubt" that the insurer had "intended the statement to refer to the" manufacturer's TKR device. Id. at 529. Further, third parties had understood the policy statement to refer to the manufacturer's device: "[N]umerous orthopedic surgeons" informed the plaintiff "they would no longer prescribe [the plaintiff's TKR] system because of concerns that it would not be covered" by Aetna. Id.

But the fact that Aetna's statement applied to the plaintiff's device just because it was a TKR device, we explained, did not satisfy the particular-reference exception: Because the policy statement was directed at a large group (the wider group of customized TKR devices), "more [was] needed." Id. at 529-30. And in Conformis, there was more. In the "background" section of the

policy statement, Aetna had dedicated an entire subsection to the plaintiff's specific product -- the only TKR device "singled out" in that way. Id. at 530. We held that this specific reference to the plaintiff's product -- and not any other product -- could lead a reasonable reader to conclude "that the Policy statement made particular reference to" the plaintiff. Id.

JB & Associates and Conformis are just two illustrations of a fundamental principle: The fact that a statement may apply to every member of a large group is not enough to trigger the particular-reference exception. As one court put it, "evidence that others 'understood'" a statement directed at a large group to refer to a plaintiff "based solely upon [the] plaintiff's membership in the referenced group will not satisfy the 'of and concerning' requirement" under the group defamation rule. Dean v. Dearing, 561 S.E.2d 686, 689 (Va. 2002) (so holding after concluding on First Amendment grounds that the plaintiffs, as government officials, could not invoke the small-group exception, see id. at 688-89); see also, e.g., Gintert v. Howard Publ'ns, Inc., 565 F. Supp. 829, 831-33 (N.D. Ind. 1983) (applying the Second Restatement test and holding that members of a group of 165 property owners could not sue for defamation over news articles about environmental contamination on their property given "the

absence of anything in the articles" identifying any of the plaintiffs as "targets" of the reporting).[11]

The plaintiffs point to Ball v. Taylor, but that decision does not flout this critical principle. In Ball, the U.S. Court of Appeals for the Eighth Circuit allowed about 100 employees to sue over a statement that they had committed disability fraud (to our knowledge, the largest group defamation claim ever permitted), but the statement was accompanied by a document that specifically identified each individual employee by name and address. See 416 F.3d 915, 916-18 (8th Cir. 2005) (per curiam).[12] The plaintiffs

---

[11] See also Dobbs et al., supra, § 531 ("[I]ndividual members of the [large] group are likewise denied relief unless . . . particular individuals can be reasonably understood as the individual targets of the defamation." (emphasis added)); 8A Alfred W. Gans et al., American Law of Torts § 29:49 (Feb. 2026 update) ("[U]nless a particular application can be shown to oneself, no member of a large group or class, by virtue of defamatory words assertedly spoken concerning the group or class, can maintain an action for libel or slander." (second emphasis added)). But see 1 Rodney A. Smolla, Law of Defamation § 4:70 (May 2026 update) (asserting that "when all members of the class are defamed . . . group size no longer matters" and citing Bean Me. Lobster, 2025 WL 416436, as a "powerful[] demonstrat[ion]" of such a rule). We note that Professor Smolla's analysis relies on Fawcett Publications, Inc. v. Morris, 377 P.2d 42 (Okla. 1962), and Florio v. Gallaudet University, 119 F.4th 67 (D.C. Cir. 2024). As we explain in Section III.B, infra, Fawcett does not follow the Second Restatement approach. And Florio held (in dicta, because the statements were protected opinion) only that the group defamation rule did not bar the defamation claims of particular fraternity members depicted in a photograph published with the defamatory statements about that fraternity. See 119 F.4th at 73-77.

[12] Every other case cited by the plaintiffs in which a court concluded that the particular-reference exception set out in the

have not pointed to, and we have not found, any case applying the rule set out in the Second Restatement that ignores this principle.

Finally, we are mindful that -- as the Aquarium and amici point out -- a broad reading of the "of and concerning" requirement may raise constitutional concerns to the extent that it deters speech on public matters. See, e.g., Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc., 233 F.3d 24, 28 (1st Cir. 2000). "[S]peech on public issues occupies the 'highest rung of the h[ie]rarchy of First Amendment values.'" Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982)).

The plaintiffs do not dispute that speech critical of industry practices frequently raises issues of public concern.

---

Second Restatement was met aligns with this principle. For example, in Church of Scientology International v. Time Warner, Inc., the court applied the Second Restatement and explained that the particular-reference exception required it to decide: (1) whether a reference to "Scientology" in an allegedly defamatory statement was a "direct[] or implied[]" reference to the specific "Mother Church" entity at the top of the church hierarchy; (2) if so, whether that reference to the Mother Church "arose solely from its status as one of the numerous entities that constitute the Church of Scientology, thus implicating the [group defamation rule]"; and (3) if so, "whether [the Mother Church] was referred to in any particular way so as to" meet the exception. 806 F. Supp. 1157, 1159, 1160 (S.D.N.Y. 1992) (emphasis added), aff'd sub nom. Church of Scientology Int'l v. Behar, 238 F.3d 168 (2d Cir. 2001). The court concluded that such a particular reference existed because, among other things, the allegedly defamatory article included a photo of the Mother Church headquarters and referred to "the Los Angeles-based church" -- the city where the Mother Church headquarters was located. Id. at 1161, 1163 (citation modified).

And speech critical of industry practices is frequently met with defamation suits. See, e.g., Tex. Beef Grp. v. Winfrey, 11 F. Supp. 2d 858, 863-64 (N.D. Tex. 1998), aff'd, 201 F.3d 680 (5th Cir. 2000) (per curiam) (speech critical of beef industry); Schuster v. U.S. News & World Rep., Inc., 602 F.2d 850, 851 (8th Cir. 1979) (speech critical of vitamin supplement industry). Thus, although we do not decide this appeal on constitutional grounds, First Amendment principles counsel against an expansive reading of the particular-reference exception.

**B. The Aquarium's Statements Are Not Actionable Under the Group Defamation Rule**

The parties agree that the group defamation rule applies here such that the Statements are not actionable unless the particular-reference exception is satisfied. The parties also agree that, as the district court pointed out, each Statement is directed at the American lobster fishery writ large, which covers more than 5,600 lobstermen in Maine alone. See Bean Me. Lobster, Inc., 2025 WL 416436, at *47. And the plaintiffs do not allege that the Statements contain an explicit reference to any of them individually.

The plaintiffs insist, however, that the group defamation rule should not bar their claims. They rest on one main point in making this argument: that the Statements' factual nature, including the claim that the type of fishing gear used by

the plaintiffs endangers the North Atlantic right whale, means that the Statements necessarily apply to every member of the fishery.[13] Thus, they contend, the Statements are materially different from the hyperbole usually lobbed at entire industries that are subject to critique, and for that reason, the district court was correct to permit their claims to proceed.[14]

To be sure, many cases barring claims against large groups based on the group defamation rule involve hyperbolic statements. See, e.g., Loeb v. Globe Newspaper Co., 489 F. Supp. 481, 483 (D. Mass. 1980) (statement that editorial staff and readers of newspaper were "paranoids"); see also Restatement (Second) of Torts § 564A cmt. a (giving as examples the Psalmist's declaration that "[a]ll men are liars" and a hypothetical statement

[13] We acknowledge the plaintiffs' assertion in their brief that they "do not base their defamation claim merely on their membership in an industry." At oral argument, however, the only other evidence that they cited in support of their contention that the particular-reference exception applies was their allegation that some of the plaintiffs' customers had understood the red rating to refer to the plaintiffs. But they also argued that if a customer could have concluded that the statement referred to a member of the group, that member would have a claim. And the only basis put forward by the plaintiffs for a customer to reach that conclusion is that the plaintiff is members of the industry.

[14] The district court cited these same rationales in determining that the "letter and spirit of the group defamation rule" were "inapposite." Bean Me. Lobster, Inc., 2025 WL 416436, at *47-48 (noting that "the industry-wide nature of the Statements necessarily implicated each and every member of the Plaintiff group" and that the Statements "purported to be based upon scientific data" rather than constituting "the type of hyperbolic statements that undergird the group defamation rule").

that "[a]ll lawyers are shysters"). But not all such cases do.[15] See, e.g., JB & Assocs., 932 N.W.2d at 75-77, 79-80 (statements about the statistical dangers of tanning beds); Noral v. Hearst Publ'ns, Inc., 104 P.2d 860, 861-62 (Cal. Dist. Ct. App. 1940) (statement that union officials were diverting dues to fund communist propaganda); Sumner v. Buel, 12 Johns. 475, 475 (N.Y. Sup. Ct. 1815) (statement that officers of three militia companies had taken certain steps to discourage those under their command from mustering when called to service and lied about it to a court-martial); Conformis, 58 F.4th at 528-30 (statements about the effectiveness and safety of a medical device).

Nor are we convinced that the Statements in fact necessarily apply to each plaintiff. Certainly, some of the plaintiffs are associations of lobstermen or are lobstermen themselves; in other words, the individuals and entities directly using the fishing gear targeted by the Statements. But as the Aquarium notes, others -- including lead plaintiff Bean Maine

[15] Further, as the Aquarium points out, the group-defamation rule arguably would be superfluous if it applied only to hyperbole: Hyperbolic statements are already non-actionable. See, e.g., Haworth v. Feigon, 623 A.2d 150, 156 n.3 (Me. 1993) (statements that are "clear hyperbole . . . are as a matter of law not actionable" (citing Milkovich v. Lorain J. Co., 497 U.S. 1, 20 (1990)); see also Nat Stern, The Certainty Principle as Justification for the Group Defamation Rule, 40 Ariz. St. L.J. 951, 991-92 (2008) (reasoning that dismissal under the group defamation rule "may operate as a substitute for the fatal absence of a provably false factual assertion" in cases involving hyperbole).

Lobster -- allege they are only involved in downstream activities such as "market[ing] and sell[ing]" of lobster.

Regardless, the plaintiffs have not cited, and we have been unable to find, any case applying the particular-reference exception that allowed a claim against a large group to proceed on the theory that the challenged statements arguably applied to each member of the large group. Instead, that theory of liability is permitted by the Second Restatement as to small groups. See Arcand, 567 F.2d at 1164 (rule permits suit "if a defamatory statement applies to all members of a small group"). But it is not permitted as to large groups, which must rely on the particular-reference exception. Restatement (Second) of Torts § 564A; see, e.g., JB & Assocs., 932 N.W.2d at 78-80 (statements about the safety of tanning beds that arguably applied to each and every tanning salon using those beds was insufficient absent a particular reference to plaintiffs' salons); Ky. Fried Chicken of Bowling Green, Inc. v. Sanders, 563 S.W.2d 8, 8-9 (Ky. 1978) (per curiam) (statements about the quality and nutritional value of KFC menu items that arguably applied to each and every franchisee serving those foods was insufficient absent a particular reference to plaintiff's restaurant). In essence, then, the plaintiffs ask us to expand the rationale of the small-group exception to cover groups of any size, so long as the statement encompasses all members of the group.

We are not persuaded by the plaintiffs' arguments. The plaintiffs rely on Fawcett Publications, Inc. v. Morris, 377 P.2d 42 (Okla. 1962) -- a case that predates the Second Restatement -- and New York and Utah cases that follow its approach.[16] See, e.g., Brady v. Ottaway Newspapers, Inc., 84 A.D.2d 226 (N.Y. App. Div. 1981); Elias v. Rolling Stone LLC, 872 F.3d 97 (2d Cir. 2017); Pratt v. Nelson, 164 P.3d 366 (Utah 2007). In Fawcett, the Supreme Court of Oklahoma adopted a multi-factor test for group defamation claims, weighing factors such as the group's size, "the intensity of the suspicion cast upon the plaintiff," and the prominence of the plaintiff within the group. See 377 P.2d at 51-52 (quoting Note, Liability for Defamation of a Group, 34 Colum. L. Rev. 1322, 1324-25 (1934)). But that is not the Second Restatement test, and so we decline to hold that the Law Court would join the small minority of states that follow the multi-factor approach. See, e.g., Dobbs et al., supra, § 531 (distinguishing the Fawcett test from the Second Restatement test); Nat Stern, The Certainty Principle as Justification for the Group Defamation Rule, 40 Ariz. St. L.J. 951, 966-67 (2008)

[16] The plaintiffs also quote the statement in Alexis v. District of Columbia that there is no "'bright line' above which a defamed group is 'too big.'" 77 F. Supp. 2d 35, 41 (D.D.C. 1999). But they neglect to quote the following line of the opinion, which states that members of a group "generally are not permitted to sue for group defamation if the group has more than 25 members [and] will almost invariably not be permitted to sue if the group has more than 100 members." Id.

("Oklahoma and New York have remained lonely enclaves of official embrace of the [Fawcett] test."); see also Pratt, 164 P.3d at 383 n.114 (adopting Fawcett in Utah).

Conformis and JB & Associates help to illustrate why the plaintiffs' claims must fail under the Second Restatement test. Although the Aquarium does not dispute that it "intended the statement[s] to refer to the" plaintiffs insofar as they fish in the American lobster fishery, and the complaint alleges facts suggesting that third parties understood the Statements to refer to the plaintiffs, here -- as in Conformis -- "more is needed." 58 F.4th at 529. And unlike in Conformis, there is no reference to the plaintiffs in particular -- nothing like the specific, exclusive identification of the manufacturer's TKR device that we concluded provided the "more" in that case. Id. at 529-30.

The facts in JB & Associates, on the other hand, are practically indistinguishable from those underlying the plaintiffs' claims. There, the defamatory statements regarding the safety of tanning beds surely implicated each plaintiff as an operator of a tanning salon just as much as statements about the dangers of particular fishing gear arguably implicate every lobsterman using that gear. See 932 N.W.2d at 75-77, 79-80. And there, as here, customers specifically referenced the statements in communications with the plaintiffs. Id. at 77, 79. But because there was nothing "more" to suggest that the statements were

particular to the tanning salon operators in JB & Associates -- beyond their mere membership in the group allegedly defamed -- the court concluded that the exception did not apply. See 932 N.W.2d at 79-80. The same is true in this case.

Finally, we are not convinced that the Law Court would endorse the other rationales for applying the particular-reference exception cited by the district court. See Bean Me. Lobster, Inc., 2025 WL 416436, at *47-49. The court emphasized that "the Statements were not merely informational but included a call to action." Id. at *48. But we are not aware of any precedent suggesting that the advocacy-based nature of a statement may take it beyond the group defamation rule. And we hesitate to conclude that the Law Court would impose such a limitation when, as amici highlight, calls to action -- including calls to boycott products and industries -- are protected under the First Amendment. See Claiborne Hardware, 458 U.S. at 909 (calls to join boycott "involve [protected] speech in its most direct form"); Thomas v. Collins, 323 U.S. 516, 537 (1945) (First Amendment protects "opportunity to persuade to action").

The district court also concluded that the lost business suffered by the plaintiffs, and in particular the allegation that customers had specifically cited the Seafood Watch rating, sufficed to establish that the statements had "special application" to the plaintiffs. Bean Me. Lobster, Inc., 2025

WL 416436, at *48-49 (quoting Sullivan v. Chester Water Auth., No. 22-cv-147, 2022 WL 2901068 at *13 (D. Me. July 22, 2022)). We recognize, as the district court did, the significance of the lobster industry to Maine's economy and culture. And we accept (as we must on review of a motion to dismiss) that Seafood Watch's red rating has caused substantial economic harm to the plaintiffs. Id. at *34, *48; see Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009).

But the new insurance policy in Conformis had "profound financial consequences" for the TKR manufacturer as well; "[s]till," we said, "more is needed" to meet the particular-reference exception. 58 F.4th at 526-27, 529 (noting that some doctors stopped ordering the plaintiff's TKR device even for patients on other insurance plans). And the fact that customers cited the Seafood Watch rating as a reason for ceasing business does not supply the required evidence that the customers "believed the statements were about [the plaintiffs] specifically" and not "aimed at [the American lobster fishery] in general." See JB & Assocs., 932 N.W.2d at 79. We therefore do not view this evidence as sufficient to demonstrate that the Statements made particular reference to the plaintiffs.

Ultimately, we conclude that the Law Court would not construe the Second Restatement's particular-reference exception to permit the plaintiffs' claims here, because doing so would go

against the great weight of authority. The courts that have accepted versions of the arguments offered by the plaintiffs apply a different test from the one set out in the Second Restatement and represent a minority view. Thus, we hold that the plaintiffs have failed to state a claim for defamation under Maine law.

## IV. CONCLUSION

For all these reasons, we **reverse** the district court's denial of the Aquarium's motion to dismiss and **remand** with instructions to dismiss the complaint.